LAND CLEARANCE FOR REDEVELOP-
MENT AUTHORITY OF the CITY OF ST.
LOUIS, Plaintiff-Appellant Respondent,

v.

Margaret S. MORRISON et al., Exceptions
of Oscar D. Heffner, Defendant-
Respondent Appellant.

No. 53984.

Supreme Court of Missouri,
En Banc.

May 11, 1970.

Rehearing Denied June 8, 1970.

Irvin Dagen, Richard M. Miller, Robert J. Hinkebein, St. Louis, for plaintiff-appellant.

W. W. Sleater, St. Louis, for defendant Oscar D. Heffner, respondent-appellant.

WELBORN, Commissioner.

Condemnation action in West End Urban Renewal Project in City of St. Louis. Petition in condemnation, filed April 21, 1966, sought to condemn, among other parcels, two four-family brick residences at 5604–06 Etzel and 1117–19 Clara, owned by Oscar D. Heffner. Landowner filed counterclaim alleging that, following filing of plan for renewal on September 17, 1964, Land Clearance Authority enticed tenants to vacate his property, knowing that if property were vacant it would be vandalized and reduced in value. Counterclaim prayed for damages for difference between $45,000, alleged fair market value of Clara property, and between $48,000, alleged fair market value of Etzel property, on September 17, 1964, and amount received in condemnation. Counterclaim dismissed on Authority's motion.

Commissioners awarded $20,000 for both tracts. Amount of award was paid to court on October 24, 1966. Both parties excepted. Trial of exceptions to jury resulted in award of $36,500 for both properties. Condemnor appeals from judgment entered on verdict. Landowner appeals from dismissal of counterclaim.

On this appeal, a major matter of contention is the bearing upon this case of the admitted depreciation in the condition of the property following the filing of the plan for renewal on September 17, 1964, and the payment of the commissioners' award, October 24, 1966. Land Clearance asserts

that defendant's evidence and trial tactics sought to emphasize the condition of property at the earlier date and thereby misled the jury as to the time as of when damages should have been determined and as to the Authority's responsibility for the decline in value. Defendant contends that his counterclaim stated a cause of action against the Authority because of the deterioration in value of the property between the filing of the plan and the legal time of taking. He asserts that counterclaim alleged facts showing an exercise of dominion over the property by the condemnor from September 17, 1964, and that, by virtue of the Fourteenth Amendment to the Constitution of the United States and Section 10 of Article I, Constitution of Missouri, 1945, V.A.M.S., he is entitled to compensation on such basis.

On the question of value, the landowner's witnesses valued the property as rental property and took into consideration the cost of placing the property in habitable condition. One witness valued the Clara property at $27,000 and the Etzel property at $27,500, with a cost of repairs of from $4,000 to $6,000 for each building. Another witness gave each house a value of $24,000. He testified that he had arrived at a depreciated value of the property, which took their damaged condition into consideration. He stated that he didn't really know the cost of repairing the property. The holder of a deed of trust on the property testified to a value of $27,000 for each building. The owner testified to a value of $30,000 for each.

The condemnor's witnesses valued the property on the basis of the improvements being beyond economical repair. They valued the property as vacant lots, less the cost of removal of the improvements. One testified to a net value of $8,500. Another testified to a value of $9,000 for both sites.

The condemnor's first two points on this appeal are interrelated. Both are based upon allegedly erroneous admission of testimony and permission of statements by the landowner's attorney, which, according to the Authority, injected into the case the condition of the property prior to the date of taking. By its first point, the Authority contends that the condition of the property at the earlier time was not an issue in the case, and that the trial court's rulings permitted the injection of such issue into the case. The second point relates specifically to evidence regarding the decline in value of the property following the adoption of the renewal plan in September, 1964. The Authority argues that the decline in value during such period was not an issue in the case, that the testimony admitted was designed to place the blame for deterioration on the Authority, and that statements tending to establish such blame had no proper purpose in the case and were highly inflammable and prejudicial to the Authority's case.

The Authority's principal reliance is upon the rules applied by this court in St. Louis Housing Authority v. Barnes, 375 S.W.2d 144, 145. In that case, the court held that the value of condemned property is to be determined as of the date of the taking; that the date of taking is the time when the commissioners' award is paid into court because that is the time when the condemnor obtains the rights of ownership in the property. 375 S.W.2d 147 [3–5]. It was held that the owner was not entitled to recover as an element of damages in the condemnation proceeding for the deterioration of the value of the property from the time of the announcement of the project for which the property was condemned. In Barnes, the project was a low-rent housing project. 375 S.W.2d 147–148 [6, 7].

Because the Authority's attack on this appeal is directed not at a particular incident or item of evidence at the trial, but at a series of incidents and their alleged cumulative effect, it is necessary to set out at some length the matters which allegedly produced the errors which the Authority now asserts. (In the following recitals, Mr. Sleater is the attorney for the landowner, Mr. Hinkebein for the Authority.)

In his opening statement, Mr. Sleater informed the jury that, prior to Land Clearance being involved with the property in question, it was in demand as rental property and it was steadily rented. "Now, Land Clearance came along and proposed this plan for taking this property, and in so doing—

"MR. HINKEBEIN: Your Honor, I object to any comment which relates to a time prior to the date of taking, which was October 24, 1966.

"MR. SLEATER: Judge, this is strictly narrative.

"THE COURT: It is an attempt to simplify the issues.

"MR. SLEATER: So, from the time that Land Clearance decided to redevelop this, the tenants moved out. There is a long story as to why any moved, but it has nothing to do with the issues or the value of this case, but when they did move out, the property became vacant and was subject to vandalism. Now, we have testimony to be presented by a man who has been in the building business, repairing storm damage, repairing buildings, since the 1930's. That is the nature of his business, and he has made a determination that for Four Thousand Dollars he could put these buildings back into rental shape. The reason we are bringing this out is because the date of the taking, the date that you are to establish the value—in other words, we could tell you without hesitation that these properties were worth X number of dollars back at the time, before Land Clearance came into the picture, but that is what the Jury is to determine.[1] You are to determine the value of this property after the date of taking, which I believe was October 24, 1966."

In Mr. Sleater's examination of Mr. Jenkins, one of the landowner's appraisers, the witness testified that he had found the demand for rental property in the area a little low, mainly because the area had been declared a blighted area.

"Q If it wasn't for that, or up until that particular time that the Land Clearance entered into the picture—

"MR. HINKEBEIN: I'd like to object to any further comment about Land Clearance. That issue is not in this case.

"MR. SLEATER: Your Honor, I am trying to establish a normal as being the matter that we are concerned with, the regular market value, and I submit to the Court that once Land Clearance was in the case, the regular market figures are not present, so we should go back to the time prior to the time Land Clearance became interested in this area, for making a comparison.

"MR. HINKEBEIN: Your Honor, to that extent, I have no objection.

"THE COURT: Very well, you may proceed.

"Q (By Mr. Sleater) If it wasn't for the fact that Land Clearance had entered into the picture, or if we take the time prior to the time that Land Clearance entered into the picture, was there a demand for rental properties of six rooms in this particular area?

"A. Yes, yes."

In Mr. Sleater's examination of the owner, the owner testified that he acquired the property in March 1958, and that from then until September of 1964, the buildings were rented all the time.

"MR. HINKEBEIN: Your Honor, I will have to object to the further testimony as to the time previous to entered (sic), around the date of taking, October of 1966.

"THE COURT: Well, I understood the last answer to start with it.

---

1. The landowner insists that the word "not" was erroneously omitted in the last clause. The Authority asserts that the landowner's approval of the transcript acknowledges its accuracy. We note that numerous corrections were made in the transcript.

"MR. HINKEBEIN: Your Honor, the testimony refers to 1964. Until he can relate that to the time of October 1966 or thereabouts, I would have to object to further testimony along that line."

The objection was overruled. The witness then testified again that he had no difficulty in renting the property until September, 1964, and that in September, 1964 he had received notice about the West End Renewal Project.

"MR. HINKEBEIN: Your Honor, I have to again renew my objection to further testimony about 1964, unless he ties it up some way to the value of this property in October of 1966. It tends to be prejudicial, to further point out the good condition of this property as opposed to the terrible condition of the property at the time of the taking, and I think the witness should not be allowed to testify further as to previous conditions of this property.

"THE COURT: Do you intend to connect it up?

"MR. SLEATER: Definitely. We have established that the best use for this property is for rental purpose, and the dates we have established are the last dates on which they were free properties. In other words, the fair market value would pertain to the condition it was in prior to the time Land Clearance started any action in here.

"THE COURT: Is it your contention that the witness is the owner?

"MR. SLEATER: The witness is the owner in fee, subject to deed of trust.

"MR. HINKEBEIN: Your Honor, the Court will recall that there has been extensive testimony about the vandalized condition of this property, the fact that it was greatly run down and not in good repair. This is unrelated to any general condition that this witness is referring to back in 1964, and I submit that 1964 values do not pertain to October of 1966.

"MR. SLEATER: Your Honor, I think if we are permitted to develop this line

with this witness, he will state the condition. The next portion that we will go into is the conditions as they existed on October 24, 1966, and what it would take to put the buildings back into the same condition they were in before Land Clearance came around.

"THE COURT: Very well. The objection will be overruled."

The witness then described the condition of the property in October, 1966 as vandalized and vacant.

The witness was again asked whether, during the period of time from 1958 to 1964, any of the units in these apartments were vacant. Mr. Hinkebein's objection that "ranging back all the way to 1958 in order to establish the condition of the premises in October 1966" was "going back too far" was sustained.

In Mr. Hinkebein's cross-examination of the owner, the witness volunteered on at least two occasions that he had no trouble renting the property until Land Clearance entered the picture.

In response to Mr. Hinkebein's interrogation about what he had spent on the property since September, 1964, the owner responded:

"A Mr. Down, in the Housing Authority, I told him about it and he said, 'Don't spend any money on decorating it.' He said, 'We are going to take it.' Mr. Andy Brown at the Building Department, he was down at Land Clearance. I seen him at his office. He said, 'Don't spend a nickel on anything.' I said, 'What shall I do?' He said, 'We are going to take it next month,' and you know, next month is three years later, now."

In concluding the cross-examination of the owner, Mr. Hinkebein inquired about the condition of the buildings in October, 1966. The owner responded that they were "going down, but there was a reason for that."

"Q But there was a reason for that. That's all. I have no further questions."

On redirect examination, the first question asked by Mr. Sleater was:

"Q What is the reason for that?

"A The direction of—

"MR. HINKEBEIN: Your Honor, any question as to who caused the damage to the property, how it got that way, why Mr. Heffner failed to protect the property, really are irrelevant, and we should not go into this any further. It seems to me we spent considerable time on this issue. The issue before the Court is the value on October 24, 1966, and I think we should limit ourselves, reasonably, to that issue.

\* \* \* \* \* \*

" \* \* \* Your Honor, I have to object to any further comment about the personnel of the Redevelopment Authority. This is not related to the issue before the Court today."

The objection was overruled upon the insistence of counsel for the owner that he was inquiring into matters raised on the cross-examination.

Upon further questioning of the witness, Mr. Hinkebein's objection on the grounds of hearsay to testimony about conversations with persons at Land Clearance was sustained.

Upon a further objection by Mr. Hinkebein to the witness's volunteering information, the court took over examination of the witness.

In response to the court's inquiry whether the properties were rented when the witness acquired them, the witness stated:

" \* \* \* They were, and they remained that way until the time I'd say '64, it must have been October of '64, shortly after that—so it must have been around '65 or July when they really started later, but up until '64 I never had any trouble at all in renting those properties, none at all, no problems."

When the witness volunteered testimony about a conversation between a Land Clearance representative and one of the former tenants, Mr. Hinkebein's objection on the grounds of hearsay was sustained. No further objection was made in the course of the court's interrogation or the witness's response, which continued following the sustaining of the objection:

"THE WITNESS: What I am trying to get at, Your Honor, after the inspectors were there, the people began to wonder, they asked us, 'Do we have to move,' and this and that, and I don't know why—I said, 'Unless you get a notice, you don't have to move.' But still, they would move for some reason.

"THE COURT: I think we will be able to get along a lot better if you attempt to answer the question and then quit talking. When was it that the last tenant moved out of there? You can give us the year.

"A Yes, sir, I believe it was in '65 on Etzel Avenue. That was the last one. That was up until about December of '65.

"THE COURT: That is the last tenant that moved?

"A Yes, sir, if I recall.

"THE COURT: So, as I understand, you had eight tenants when you lost (sic) the building and three years later was it or five years later, there was one tenant?

"A No, I believe it was sooner than that, wasn't it?

"THE COURT: Maybe '58 to '66.

"THE WITNESS: That's about eight years.

"THE COURT: When was this property damaged or destroyed or taken over by Land Clearance? The exact date? There has been a date here used of October 24, 1966. \* \* \*

"MR. HINKEBEIN: That is the date of taking, Your Honor.

\* \* \* \* \* \*

"THE COURT: Now, if we assume the taking date of that property was October 24, 1966, did it have any tenants in the building at that time?

"THE WITNESS: No, sir.

"THE COURT: And how long had there been no tenants in that building?

"A Oh, it had been maybe almost a year.

"THE COURT: And then you acquired no new tenants because the property had been turned over?

"A Yes."

In the final portion of Mr. Sleater's closing argument:

"MR. SLEATER: Judge, ladies and gentlemen of the Jury, we have before you evidence as to the highest and best use of this property, and in determining its fair market value, that is what is to be considered. The only testimony as to its highest and best use is it has been used as a four-family building in each instance. We have the action of the Land Clearance, as was testified to and brought out in evidence, that their plan was to tear down this building. In other words, this wasn't a building that they were going to renovate like they are doing some of them. It was to be torn down from the beginning, the men who were the officials at Land Clearance told Mr. Heffner—

"MR. HINKEBEIN: Your Honor, I am going to object to going out of the issues.

"THE COURT: Counsel should stay within the evidence and the Jury will be guided by their own recollection of what the evidence is.

"MR. SLEATER: It was in the evidence, Your Honor. You remember Mr. Heffner's testimony and he named names

as to the men who told him that and consequently, when the tenants were moved out, the building was left vacant. This is no reflection upon Mr. Heffner, who was lulled into a false sense of security in that the buildings were permitted to deteriorate from their rental condition in September of '64 to the condition they were in October 24, 1966. That is the date that we are to determine the value of the buildings, but the highest and best use for these buildings is as four family rental units."

The combination of incidents relied upon by the Authority as a basis for trial error is susceptible to a combination of answers. For example, in several of the incidents, no objection was made at the time. Such is the situation with regard to the statements of the owner on his cross-examination which the Authority now calls "unresponsive." If they were, the Authority could have sought to have them stricken. No such relief was sought. It is no answer to failure to seek such relief that objections on other, and to the Authority, related grounds, were overruled. In at least two of the incidents relied upon, the Authority's objections were sustained. In other incidents, the Authority's objections were conditional. "Until he can relate that [time, 1964] to the time of October, 1966 or thereabouts, I would have to object to further testimony along that line." "Your Honor, I would have to again renew my objection to further testimony about 1964, unless he ties it up some way to the value of this property in October of 1966."

 Insofar as an over-all approach is concerned, we must start with a concession by the Authority's counsel at the trial that there could have been some relevancy to evidence regarding the condition of the property in September, 1964. As above set out, when, upon Mr. Hinkebein's objection to an inquiry about the demand for rental property in the area before Land Clearance came into the picture, Mr. Sleater explained that he was trying to show that once Land Clearance came into

the picture, regular market values were not present. Mr. Hinkebein's response: "Your Honor, to that extent, I have no objection." On this appeal, the Authority asserts that this concession was not of the fact of an abnormal market, but of the admissibility of evidence to show that an abnormal market existed. Once, however, it is conceded that this was a case in which there might have been an abnormal market question, a general objection to statements or testimony with respect to the condition of the property, prior to October 24, 1966, becomes impossible to sustain. ·

█ In this case, the landowner sought to establish the value of the property by the capitalization of the rental income from the property. This is a recognized method for arriving at the fair market value of rental property. State ex rel. State Highway Commission v. Flynn, Mo.App., 263 S. W.2d 854, 857 [13] [14]; 29A C.J.S. Eminent Domain § 168(2), p. 723, et seq.

█ The Authority does not contend that such method of valuation was not available in this case, although their appraisers adopted a different theory. In order to establish a base for rental capitalization, the landowner, by his evidence, sought to show that throughout his ownership, the properties had been fully rented. Obviously, under such an approach, some explanation for the vacancy and the condition of the buildings at the legal time of taking was in order. The evidence objected to was designed to provide this explanation. The Authority, in its withdrawal of its objection to the question posed to the landowner's witness, tacitly admitted, at least, the possibility of showing an abnormal market. If evidence was properly admitted for such purpose, it does not matter that such evidence might also have given rise to some inferences unfavorable to the Authority. The Authority sought no instruction limiting the effect of such evidence. Considered as a whole, we do not find the testimony and statements regarding the condition of the property prior to October,

1966 to have been erroneously admitted or permitted and we reject the assignments of error based upon such proposition.

█ The Authority assigns error in the trial court's ruling on its objection to the testimony of the landowner's witness, Redler. Redler testified that he held a second deed of trust for around $4,900 on each building. He testified that he had been lending money on second deeds of trust for about five years and that during such time he had valued about 150 parcels of property. He testified that around October 24, 1966, he appraised the property here in question and valued the Etzel at about $27,000. Further questioning showed that, although the witness had viewed the exterior of both properties at such time, he had not actually examined them on the interior. When the trial court sustained objection to further testimony of the witness because of his lack of knowledge of the actual condition of the premises, the landowner's attorney interrogated the witness as to his valuation of the properties, based upon rental capitalization. The witness explained his rental capitalization approach and was asked his valuation of the property based upon such approach, taking into consideration his experience in the investment field and his investment in the particular property. The Authority objected to the question on the grounds that the witness did not know the property. The Authority also objected that the evidence showed that the property was not tenantable and could not, therefore, be valued by the witness on such basis. The objection was overruled and the witness stated that, based on the return from the property, he would value each at from $27,000 to $27,500.

On this appeal, the Authority contends that admission of this testimony was error because the witness admitted that he had not made an adequate inspection of the property on October 24, 1966.

We find no prejudicial error in the trial court's permitting the testimony of this witness to stand. At the most, his testi-

mony of value based upon the rental capitalization was cumulative to the testimony of the landowner's other appraisal witnesses. The jury was clearly informed that the witness's testimony did not take into consideration the cost of placing the property in a tenantable condition. In his closing argument to the jury, the landowner's counsel acknowledged that the valuation given by Redler should be viewed in the light of other evidence of the cost of rehabilitation of the property.

In view of the witness's interest in the property, the cumulative nature of his actual testimony, and the acknowledgment that the witness's valuation should be discounted by the cost of repairing the buildings, we find no prejudicial error in the trial court's rulings on his testimony. State ex rel. State Highway Commission v. Hart, Mo.App., 417 S.W.2d 193, 196 [3–5].

We turn to the landowner's appeal from the dismissal of his counterclaim. The counterclaim alleged that his two parcels of property were valued at $45,000 and $48,000, on September 17, 1964, when the plan for redevelopment was filed; that thereafter a public hearing was held, at which it was made clear that the property would be taken; that the Authority thereafter enticed all of the tenants to leave the properties, knowing full well that, if the real estate were vacated, it would be vandalized and depreciate in value. The counterclaim alleged that, by virtue of its acts, the Authority had exercised dominion over the property since September 17, 1964 without compensation to the landowner. The counterclaim alleged that the Authority, knowing full well that the property would depreciate in the meantime, delayed filing of its condemnation suit until April 29, 1966, although the filing of the plan for redevelopment had effectively taken the property off the market. The counterclaim asked for judgment in the amount of the difference between the condemnation award and the alleged market value of the properties on September 17, 1964. The Authority's motion to dismiss the counterclaim was sustained.

The landowner's appeal presents two questions: First, does the counterclaim state a claim upon which relief may be granted? Second, if so, may such a counterclaim be maintained in the condemnation proceeding?

In St. Louis Housing Authority v. Barnes, supra, this court held that reduction in value of property as a result of the announcement of a project involving its being taken for a public use could not be considered as an element of damage in proceedings subsequently undertaken to condemn the property. The decision was based largely upon the en banc decision in State ex rel. City of St. Louis v. Beck, 333 Mo. 1118, 63 S.W.2d 814, 92 A.L.R. 373, that damages alleged to have been suffered by a property owner as a result of pendency of condemnation proceedings could not be considered in determining the compensation due the owner on final taking. In Beck, the original petition in condemnation for a street widening project had been filed in 1920. Originally all of the property of the landowner was to have been taken. In 1931, the project was changed and only a small portion of the property in question was taken. When commissioners were to consider value of property finally taken, landowner sought to have considered as items of damages, "the decrease in rental values, including the inability to rent the property for any definite period of time, the inability to improve the property, the inability to sell the property at a fair price, and the inability to finance the property upon reasonable terms." 63 S.W.2d 814. In holding that these items were not to be considered, the court stated (63 S.W.2d 817):

"We do not undertake to decide if the realty company is entitled to any damages on account of the pendency or delay of the condemnation proceeding itself, and if there is any damage on account of such proceedings, it is of a personal character, as

distinguished from any damage to the property itself, and is not an element to be considered by the commissioners in assessing benefits and damages in this proceeding."

The court concluded that " * * * there will not, as regards damages for pendency and delay of the suit, be a taking of the property or a damage of the property as is contemplated by the Charter of the City of St. Louis or the Constitution of this state that can be determined in a condemnation suit." 63 S.W.2d 816. This conclusion was based upon the finding that "the pendency of the condemnation suit in no way affected the property itself and, therefore, did not damage the property." Ibid.

The theory of the landowner's counterclaim in this case is that, prior to the legal taking of the property, the Authority did exercise dominion over his property by causing his tenants to vacate the premises, with the result that it was vandalized and damaged long before the actual taking. In making such contention, the landowner relies not only upon the state constitutional provision (Section 10, Article I, Constitution of Missouri 1945), but also upon the Fourteenth Amendment to the Constitution of the United States. There is no reference to federal constitutional provisions in Beck. In Barnes, it was specifically noted that claims, based upon federal constitutional provisions, were not before the court. 375 S.W.2d 146–147 [1–2].

In two fairly recent cases, United States district courts have held that activities of a public body similar to that here alleged may constitute a taking within the meaning of the federal constitution. Foster v. City of Detroit, 254 F.Supp. 655, E.D.Mich., S.D., 1966, was an action to recover damages against the city. In 1949, city officials undertook to get a public housing project under way. A condemnation petition was filed in 1950, and a notice of lis pendens was filed. A portion of the property sought was condemned in 1954. However, no housing was built on that or any other part of the property involved because in 1955 the Federal Housing Authority ordered the project halted. In 1960, the condemnation petition was dismissed and the lis pendens removed. However, in 1959, an urban redevelopment project was approved, which included property formerly sought for the housing project and in 1961 condemnation action was begun pursuant to that project.

The Fosters owned rental property in the area. They were notified in 1949 that their property would be taken and were told not to improve this property in an effort to get more money from the city. From 1950 to 1954, the Fosters' property continued to be rented. After 1954, when adjacent property had been razed, the Fosters were unable to get tenants. After 1954, the buildings deteriorated rapidly. In 1958, city officials directed the Fosters either to put the buildings in safe condition or tear them down. After unsuccessfully trying to get the city to tear them down and deduct the cost from any condemnation award, the owners demolished them at a cost of $1,500. When the second condemnation action was begun, the Fosters had only vacant lots, for which they received $5,200 in the condemnation action. In holding that the Fosters had a right of action against the city for the deterioration in value of this property after 1954, the court found "that the city actually encouraged and aggravated this deterioration after the commencement of the proceedings through the actions of various city officials. These actions include, informing plaintiffs that they would receive no compensation for improvements and that they were only to 'keep the roof on and the water running', requiring the signing of a 'Waiver of Claim for Damages' as a condition precedent to the issuance of a building permit, actually completing the condemnation and clearance of several blocks in the area, requiring the razing of many vandalized buildings, and keeping the lis pendens in effect for five years after the Public Housing Administration

had issued a stop order on the project, all the while telling those who inquired that the property would be condemned soon. There is also evidence that the lis pendens had the effect of impairing sales of property, thus reducing sales prices and values. Therefore, this court finds, as a matter of fact, that the protracted delay and the actions of the defendant, if they were not the only causes, substantially contributed to, hastened and aggravated the deterioration and decline in value of the area in general and of plaintiffs' property in particular." 254 F.Supp. 662.

Acknowledging that the United States Supreme Court had not considered whether or not the actions of the city amounted to a "taking," the court pointed out that the Michigan Supreme Court in City of Detroit v. Cassese, 376 Mich. 311, 136 N.W.2d 896, arising out of the same acts of the city, held that the city's actions constituted a taking.

In its conclusion, the district court stated (254 F.Supp. 665–666):

"Thus, this court now holds that the actions of the defendant which substantially contributed to and accelerated the decline in value of plaintiffs' property constituted a 'taking' of plaintiffs' property within the meaning of the Fifth Amendment, for which just compensation must be paid."

In Sayre v. United States and the City of Cleveland, 282 F.Supp. 175, the United States District Court for the Northern Division of Ohio reached a similar conclusion. That case arouse out of an urban renewal plan in the City of Cleveland. The complaint sought damages against both the United States and the City. The motion of the United States for summary judgment was sustained, but the complaint was held to state a cause of action against the city. The court rejected the claim against the city based upon allegations of negligence in carrying out the project. However, the complaint was held to state a cause of action based on abuse of the exercise of the power of eminent domain. The basic allegations found to state a claim were as follows (282 F.Supp. 181–182):

"At all times referred to in this Complaint, the laws of the State of Ohio contain numerous provisions for procedure to be followed by the defendant The City of Cleveland for the appropriation by said defendant of real property under the urban renewal plan referred to in this Complaint. Among said steps were the announcement of the proposed plan to be public, the adoption of the plan by the Council of the defendant City, after a public hearing; and thereafter the furnishing by the defendant City of notices directed to the owners and occupants of specific real property indicating the intention of the defendant City to acquire such real property either by negotiation or by means of appropriate legal action. As heretofore set forth, the defendant City undertook to notify the plaintiff's bankrupt of its intention to appropriate numerous parcels of real property within the Hough urban renewal area, pursuant to the plan adopted by said defendant. At the same time, said defendant undertook to notify the occupants of said premises owned by the plaintiff's bankrupt. This action on the part of the defendant City, carried out in the manner hereinbefore described, constituted the initial steps in the appropriation of the property of plaintiff's bankrupt, which appropriation the defendant City never carried to completion and which said defendant at no time had the facilities or the ability to consummate.

"Paragraph 1 of the complaint as amended states that jurisdiction in the within action is 'conferred by the provisions of the Fifth Amendment and the Fourteenth Amendment to the Constitution of the United States.' Paragraph 33, added by the supplement to complaint, states in part that the:

"conduct of the defendant City heretofore described in this complaint, and described in particular in paragraph 32, constituted a pro tanto taking and appropriation of

the property of plaintiff's bankrupt, with all of the consequences heretofore described, for which taking no compensation whatsoever has been or will be offered."

In holding that the complaint stated a cause of action based on violation of the Fifth and Fourteenth Amendments, the court also had the support of an Ohio Court of Appeals opinion, likewise involving a Cleveland urban renewal project, in City of Cleveland v. Carcione, 118 Ohio App. 525, 190 N.E.2d 52, 5 A.L.R.3d 891. In Carcione, the urban renewal project had been authorized by the city council in 1957. In October, 1959, a council resolution was passed, declaring the intention to appropriate the area in question. The condemnation action was not filed until May 4, 1962, and the cause was tried by a jury on June 26, 1962.

The Carcione property included two stores and fourteen apartment units. Following the authorization of the project, tenants living in the area who received public assistance were notified that unless they moved out of the area within a reasonable time, their rental allowance would be terminated. Two tenants of Carcione received such notice and moved. Welfare department caseworkers instructed persons in the area to move elsewhere.

Rental income on the Carcione property decreased from $8110 in 1957 to $565 in 1961. At the time of trial, one store was rented for $50 per month and two apartments were occupied by persons unable to pay rent. By that time, the buildings had been extensively vandalized. The city's program of demolishing property as it was acquired had resulted in the demolition of 545 buildings out of a total of 584, leaving the Carcione property and a few other buildings "standing in a vast desert."

The jury was instructed that the defendant's compensation should be measured by the fair market value of the property at the time of the trial. The court of appeals held that this was error. The court stated (190 N.E.2d 57, 5 A.L.R.3d 898):

"In Ohio, the rule of law generally adopted in appropriation proceedings, where the appropriator has not taken possession of the property prior thereto, is that the value of the property taken be computed by the jury as of the time of trial. 19 Ohio Jurisprudence, 2d, 535, Eminent Domain, Section 118.

"However, the application of that rule of law may result in an award of compensation to the owner of the property appropriated which is unreasonable and unjust under unusual facts and circumstances, as are present in the case at bar. Under such circumstances, the time as of which the evaluation of the property should be made must comport with the peculiar facts and circumstances of the case so as to assure the owner of the property compensation in money which is just as contemplated by the Constitution of Ohio."

In City of Buffalo v. Strozzi, 54 Misc.2d 1031, 283 N.Y.S.2d 919, the court held that when a city had adopted a resolution for an urban renewal project in 1964, but did not commence condemnation until 1967, the owner of a building producing an income of $5,520 per year in 1964, which since became vacant, suffered a fire and was in shambles, was entitled to a recovery of $25,000, based upon the prior value of the property.

On the other hand, in Naumann v. Urban Renewal Agency of City of Austin, 411 S. W.2d 803, the Texas Court of Civil Appeals held that there was no error in refusing to submit the issue of value in condemnation as of the date of the adoption of an urban renewal plan. In Redevelopment Agency of City of Richmond v. Maynard, 244 Cal. App.2d 260, 53 Cal.Rptr. 42, 46 [6], the court stated that "the condemnee must bear the risk of destruction of a material part of the property, whether by fire or by vandalism, until the condemner takes either title to or possession of the property." In Housing Authority of City of Decatur v. Schroe-

der, 222 Ga. 417, 151 S.E.2d 226, the court held that an instruction permitting the jury in condemnation proceedings to consider loss of rents caused by tenants vacating premise several months prior to institution of condemnation action, believing its destruction was imminent, was erroneous.

■ The Naumann case was based upon a statute fixing the time for determination of compensation as the time of filing suit, which the court found not in conflict with state constitutional provisions against taking or damaging private property for public use without adequate compensation. In Schroeder, the Supreme Court of Georgia reversed a court of appeals decision in which the court of appeals stated: "Just and adequate compensation means putting the deprived landowner as nearly as possible back in the same monetary position he was in before the seizure occurred. The government may not depress the value of land, whether by signs causing the public to think the land has already been taken, or by public announcements indicating imminent seizure, so as to deprive the owner of the use to which the property is being put, and then contend that the depressed value is in fact the true value of the property on the date the technicalities of the 'taking' have been performed." Housing Authority of City of Decatur v. Schroeder, 113 Ga.App. 432, 434, 148 S.E.2d 188, 190. The Supreme Court relied on Hard v. Housing Authority of City of Atlanta, 219 Ga. 74, 132 S.E.2d 25, in which the court held that, since compensation must be determined as of the time of taking, a landowner was entitled to the benefit of evidence which showed that the announcement of a proposed urban renewal project enhanced the value of his property. The reasoning of the Georgia court appears unique. Generally, the rule is that the effect of the proposed improvement in enhancing the value of the property taken may not be considered. The reverse of the situation is frequently relied upon to prevent the condemnor's taking advantage of the depreciation in value which the project produces. See City of Cleveland v. Carcione, supra, 118 Ohio App. 525, 190 N.E.2d 52, 5 A.L.R.3d 898. In St. Louis Electric Terminal Ry. Co. v. MacAdaras, 257 Mo. 448, 166 S.W. 307, 310, the court stated:

" * * * If, when property is taken in toto, as here, it be the rule that the owner can have considered, as an element of his damages, the enhanced value of the property occasioned by a partial construction of the railroad, and its incidents (such as depots, switches, etc.), then the converse of the proposition should likewise be true; i. e., that, if a partial construction of the contemplated road and its incidents, above named, had depreciated the property sought to be taken, then the railroad should have the benefit of such depreciation, when it actually came to the taking of the property. No court would stand for this latter rule, and yet it is the very converse of the one sought to be enforced here. The proper rule, when the whole property is being taken, is not to allow the jury to consider either enhancements or depreciation brought about by the construction of the improvement for which the property is being taken. In other words, the value should be determined independent of the proposed improvement."

In City of St. Louis v. Brown, 155 Mo. 545, 56 S.W. 298, 302 [5], in discussing the eminent domain provision of the 1875 Constitution (Section 21, Article II), the court stated: "If we will take our constitution at its word, and give effect to it according to its plain meaning, we can have no difficulty in determining the proper measure of damages in such case. Courts lay down general rules for the guidance of the jurors and commissioners which are sometime serviceable, but any rule that may be laid down must itself be measured by the rule given in the constitution, and any rule that so limits the damages in such case as that the result will be in fact less than just compensation for the injury suffered falls short of the constitutional measure."

■ What might be described as extreme cases, such as Foster v. City of Detroit, supra, where the city in effect tied up the property for ten years, although it knew the project had been ended, and City of Cleveland v. Carcione, supra, where city officials went to extremes to remove the landowner's tenants and pursued an acquisition policy which resulted in the valuation of the Carcione property only one of a few pieces "left standing in a vast desert," present situations in which the traditional rules of valuation fail to meet the constitutional requirements. On the other hand, the constitutional obligation does not and cannot guarantee an absolutely perfect system of reimbursement for every owner whose property is adversely affected by activity of a public body. See Hamer v. State Highway Comm., Mo.Sup., 304 S.W.2d 869.

In this case, we have not merely the allegations of the landowner's counterclaim. We also have the benefit of his offer of proof, outlining the evidence with which he proposed to support the allegations of his petition. His offer was to prove that his properties were fully rented on September 17, 1964, the date that the Land Clearance Authority placed its plans for the West End Redevelopment Project on file; that thereafter notices of public hearing were published in St. Louis newspapers, in which the plan to take property including that of the appellant landowner was set out; that a public hearing was held on November 19, 1964. "Thereafter, the plaintiff, through the agents, servants and employees, did contact the tenants of the defendant in the two parcels involved herein; in particular they did contact Mrs. Nora Hopkins, they did contact Mrs. Myrtle Ellis, they did contact a Mrs. Davis, they did contact a Mr. Willie Gyzen, they did contact a Mr. M. Collier, and encouraged them to move from the premises owned by the plaintiff and did find for them other quarters, some of which were accepted by these persons that were contacted and others were not. The plaintiff from its experience in the City of St. Louis knew full well that prop-erties would depreciate when vacant, but nevertheless, did stall and delay in that it did not file a condemnation suit until April 29th, 1966. That by reason thereof, it had exercised dominion over the property since September 6th, 1964; and during the time September 17, 1964 and October 24, 1966, the defendant, Oscar Heffner, had lost in excess of Twenty-one Thousand Dollars in rent, the property had been vandalized and had depreciated in value as has already been introduced in evidence." The offer of proof also offered to prove that the Authority publicly announced a program for the relocation of tenants in the redevelopment area.

The allegations of the landowner's counterclaim together with his offer of proof must also be considered in the light of the petition in condemnation setting forth the procedure followed by the Authority. The petition alleges that the Board of Aldermen of the City of St. Louis approved the proposed plan by ordinance approved December 28, 1964; that thereafter the agency entered into a cooperative agreement dated March 12, 1965 with the City of St. Louis for execution of the plan; that the Authority made application for federal financial assistance for the project, and accepted an offer for such assistance dated May 13, 1965. On February 17, 1966, the Authority adopted a resolution, as required by § 99.460(1), RSMo 1959, V.A.M.S., declaring that the acquisition of the property in the West End project was necessary to carry out the project. The adoption of such resolution is a prerequisite to the exercise of the power of eminent domain. The petition in condemnation, affecting the property of the landowner here, was filed on April 21, 1966.

■ In our opinion the record refutes the conclusionary allegation and statement of the landowner that the Authority "stalled and delayed" the filing of its condemnation proceeding. The record shows that the procedures involved necessarily were somewhat protracted. However, the record itself refutes any inordinate delay on the part of the Authority.

■ The principal reliance of the landowner is upon the activity of the Authority which caused his tenants to vacate. Section 99.430(7), RSMo 1959, V.A.M.S., requires an urban renewal plan to be accompanied by "a statement of a feasible method proposed for the relocation of families to be displaced from the land clearance or urban renewal project area." Section 99.420(11), RSMo 1959, V.A.M.S., grants the Authority power to make plans and "provide reasonable assistance for the relocation of families displaced" by a project. Although the landowner's counterclaim employs the language "enticed," his offer of proof was merely that the Authority had contacted five of his tenants and "encouraged them to move." His offer of proof did not show when such activity occurred, nor when the tenants moved. The court, in interrogating the owner as a witness, endeavored to obtain this information from the owner, but he was quite vague as to just when the property became vacant.

In our opinion, the counterclaim does not allege facts, considered in the light of the landowner's offer of proof and the entire record in this case, justifying a finding of a taking by the Authority prior to the regular legally fixed date of taking. As we stated above, this is not a situation of aggravated delay or untoward activity on the part of the Authority such as has been found to have constituted a taking in the Michigan and Ohio cases. If such cases arise in Missouri, they will be dealt with on their facts. In the meantime, we need pursue no further the question of the proper method of raising the question here attempted to be raised.

■ The landowner also objects to the judgment entered on the grounds that it fails to provide the interest to which he was entitled under § 523.045, RSMo 1959, V.A.M.S. That section provides, in part, as follows:

" * * * If, within thirty days after the filing of any such commissioners' report the condemnor shall have paid the amount of any commissioners' award to the persons named in the petition as owning or claiming any property or rights or to the clerk of the court for them and the amount of such award shall be superseded by a subsequent verdict or amount larger than the award paid, then interest on the amount by which such verdict exceeds the award, at the rate of six per cent per annum from the date of filing the report, shall be added to the amount of the verdict; but if the amount of the award shall be superseded by a subsequent verdict or amount smaller than the award paid, then judgment shall be entered against said persons named to repay to condemnor the amount by which the award paid exceeds the amount of the verdict, with six per cent interest on such excess payment from the date of the payment of the award."

Following the jury's return of the verdict, the trial court entered a judgment, reciting the jury verdict, and adjudging that defendant have and recover of the plaintiff as the fair market value of the property taken the sum of $36,500, together with costs. The landowner filed a motion for new trial, relating only to the issues raised by his counterclaim. Following the overruling of the landowner's motion and the Authority's motion for new trial, the court entered a new judgment in favor of the landowner and against the Authority in the amount of $16,500, being the excess of the jury verdict over the commissioners' award. (The judgment appearing in the transcript erroneously recites that the amount is the excess of the commissioners' award over the award of the jury.)

On this appeal, the Authority contends that the landowner is not entitled to the interest which § 523.045, RSMo 1959, V.A.M.S., grants him because the omission was not called to the attention of the trial court. The landowner replies that he was not aware of the form of the final judgment until after his and the Authority's after-trial motions had been overruled and therefore he had no opportunity to call the matter to the trial court's attention.

The right of the landowner to interest from the date of filing of the commissioners' report until the entry of judgment on June 4, 1968, is clear. The failure of the trial court to provide for it is a matter which we will notice under Civil Rule 79.04, V.A.M.R., without regard for its having been called to the attention of the trial court.

The Authority does not question the amount to which the landowner says he is entitled for interest, $1,597.72. Therefore, the judgment will be amended to read as follows:

"NOW THEREFORE, Judgment entered in favor of said defendant against plaintiff in the amount of $16,500.00, being the excess of the award of the jury over the Commissioners' Award in this cause with respect to Parcel 1006, plus interest at the rate of 6% from the date of filing of Commissioners' Report, October 17, 1966, to June 4, 1968, on said $16,500.00, amounting to $1,597.72."

Judgment, as amended, affirmed.

PER CURIAM:

The foregoing opinion by WELBORN, C., is adopted as the opinion of the Court.

HENLEY, C. J., MORGAN and HOLMAN, JJ., and HOGAN, Special Judge, concur.

FINCH, J., dissents in separate dissenting opinion filed.

DONNELLY and SEILER, JJ., dissent and concur in separate dissenting opinion of FINCH, J.

BARDGETT, J., not participating because not a member of the Court when cause was submitted.

FINCH, Judge (dissenting).

I respectfully dissent from the principal opinion herein. I would hold that the trial court erroneously dismissed defendant's counterclaim and would remand the case for trial thereon.

The Authority's petition in condemnation herein was filed on April 21, 1966. On May 26, 1966, Heffner filed an answer and counterclaim. The Authority then filed a motion to dismiss the counterclaim and on June 23, 1966, the court sustained that motion and dismissed the counterclaim. Subsequently, the commissioners filed their report and in April, 1968, the case was tried on exceptions to that report.

The counterclaim having been dismissed by the court, the case was tried solely on the issue of the value of the property taken in condemnation, and in that connection the court instructed the jury that it should award Heffner "such sum as you believe was the fair market value of defendant's property immediately before the taking on October 24, 1966."

Heffner does not attack or appeal from the judgment entered on the petition in condemnation. He does not seek to change the rule fixing the valuation date as the time when the amount of the commissioners' award is paid into the registry of the court. Instead, he asserts that the Authority in connection with its ultimate condemnation of his property began to and did exercise dominion over his property from and after September 17, 1964, thereby damaging and depreciating his property in direct violation of both Missouri and federal constitutional provisions unless he is compensated therefor.

The first question presented is whether it is permissible in Missouri to have a counterclaim for damage done to the property by condemnor prior to the date of taking as of which the condemnation award is determined. This question is posed but not reached or answered in the principal opinion because it concludes that the counterclaim was properly dismissed as not stating facts justifying a finding of a taking by the Authority prior to the date of payment of

the commissioners' award into the registry of the court.

In my view, such a counterclaim is permissible. A recent decision by the St. Louis Court of Appeals will illustrate. In Harris v. L. P. and H. Construction Co., Mo.App., 441 S.W.2d 377, defendant telephone company, through its contractor, erected telephone lines across plaintiff's land without first condemning an easement therefor. Plaintiff brought suit for trespass and for cutting of trees on the property. The telephone company, in what it called an affirmative defense but which the court treated as a counterclaim, sought by "inverse condemnation" to acquire an easement over the property. The trial court permitted the telephone company to condemn as of the date it first trespassed and entered judgment for the condemnation award of $800. The Court of Appeals held that it was error to permit condemnation on a retroactive basis, saying, 441 S.W.2d l. c. 384: "No authority exists under the condemnation statutes for the assessment of past damage resulting from defendants' trespass. In short, the proceeding by way of condemnation cannot relieve defendants from liability for the damages resulting to the plaintiffs from the prior trespassing. The trial here proceeded on the basis that the jury therein was assessing in a condemnation action all damages sustained by plaintiffs as a result of all the conduct of the Telephone Company or its agents. This was beyond the scope of a condemnation proceeding and requires reversal of the judgment."

The judgment was reversed so as to permit plaintiff to try his petition for damages which accrued prior to the condemnation. It is apparent that while the parties in this inverse condemnation situation were reversed from the usual order, actually the counterclaim there corresponds to the petition in condemnation and the petition for damages which was remanded for trial corresponds to a counterclaim for antecedent damages such as Heffner seeks to maintain.

I do not consider that State ex rel. City of St. Louis v. Beck, 333 Mo. 1118, 63 S.W.2d 814, or St. Louis Housing Authority v. Barnes, Mo., 375 S.W.2d 144, hold that a counterclaim is not permissible. The question of whether a counterclaim could be asserted was not involved. Beck was an original prohibition proceeding to prohibit the trial judge from including in his instructions to the commissioners an authorization to hear evidence as to whether damage had been sustained by reason of the long delay in which an original proceeding was abandoned and a new one instituted or because the new suit sought only part of the property described in the original suit. The court held, 63 S.W.2d l. c. 817:

"We do not undertake to decide if the realty company is entitled to any damages on account of the pendency or delay of the condemnation proceeding itself, and if there is any damage on account of such proceedings, it is of a personal character, as distinguished from any damage to the property itself, and is not an element to be considered by the commissioners in assessing benefits and damages in this proceeding. Petition of Pittsburgh, 243 Pa. 392, 90 A. 329, 52 L.R.A.,N.S., 262.

"We, therefore, believe that the respondent would be acting in excess of his jurisdiction in giving an instruction to the commissioners to consider such damages as are set forth in the realty company's motion."

Barnes was a condemnation suit by the Housing Authority, but no counterclaim for damages to the property from the date of taking was involved. Instead, the owner sought to have the court instruct the jury that in assessing damages (making the condemnation award) they could "take into consideration any damages caused to defendant's property as a result of the institution of the condemnation proceedings, either by the actual filing of the condemnation petition or by the announcement of plans for condemnation and the effect of such announcement on the value of such property if you find that such announce-

ment, if any, caused the property to change in value."

Relying on Beck, supra, this court in Barnes held that such damages could not be recovered as an element of damage for the taking. Neither case held that the owner could not recover for damages preceding the taking, if shown. In the determination of the condemnation award in this suit Heffner did not seek to include damages caused by the Authority prior to the commissioners' award. Instead, he sought to recover therefor in the counterclaim which he filed. These damages allegedly accrued as a result of actions of the Authority which preceded but led up to its ultimate condemnation of the property. Admittedly, the award in condemnation did not take into account or compensate for depreciation in value (here acknowledged) which occurred after the Authority announced its plan on September 17, 1964, and before the commissioners' award was filed on October 24, 1966. Unless the landowner is permitted in some action to allege and prove that the Authority did damage and depreciate the value of his property by acts prior to the commissioners' award in condemnation, then he is forced to bear that loss himself and the provision in Article 1, Section 26 of the Constitution of Missouri, 1945, saying "That private property shall not be taken or *damaged* for public use without just compensation" (emphasis supplied) becomes an empty constitutional guarantee in his situation. In my view, he should be given the opportunity to prove that his property was damaged by acts of the Authority. The determination of such issues relates to the same subject matter as those in the petition in condemnation and should be litigated in a counterclaim in that action.[1] This is the sort of situation which the compulsory counterclaim rule (S.Ct.

Rule 55.45, V.A.M.R.) contemplates. It actually is comparable to the procedure approved by the St. Louis Court of Appeals in Harris v. L. P. and H. Construction Co., supra.

The second question presented is whether Heffner's counterclaim alleges sufficient facts to state a claim. It alleges that on September 17, 1964, the plaintiff placed on file a proposed plan for redevelopment of the area in which Heffner's two 22-room, four-family brick buildings were located and proposed to acquire such property. The two buildings are alleged to have been worth $45,000 and $48,000, respectively, on September 17, 1964. It also is alleged that notices of a public hearing thereon were published in late October and early November, 1964, and that such public hearing was held November 19, 1964, at which the Authority's intention to acquire land including Heffner's tracts was clearly set forth. The counterclaim alleges that the Authority enticed all the tenants in both buildings to move, knowing that if the property was vacant it would be vandalized and would depreciate in value. It also alleges that filing of the condemnation suit was delayed until April 29, 1966, although the plaintiff had exercised dominion over the property from and after September 17, 1964. The counterclaim states that the actions of plaintiff in exercising dominion over the property without compensation to the owner and prior to condemnation thereof violate the Fourteenth Amendment to the Constitution of the United States and Article I, Section 10 of the 1945 Constitution of Missouri. It seeks recovery of the difference in value between the sums of $45,000 and $48,000 and the amounts awarded in condemnation for the taking as of October 24, 1966. These allegations, in my view, are sufficient to allege that the

1. The other alternatives would be to permit recovery therefor in the actual condemnation award by moving back the date of taking and to instruct the jury accordingly as directed in City of Detroit v. Cassese, 376 Mich. 311, 136 N.W.2d 896, or to permit a separate suit therefor.

If the landowner is to be denied the opportunity to prove his claim in this counterclaim, the principal opinion ought to indicate the vehicle and means by which he will have his day in court on his constitutional guarantee.

Authority by its actions damaged the landowner's property without compensation therefor, contrary to the applicable constitutional provisions.

As previously noted, this counterclaim was stricken on motion and was not tried. During the course of the presentation of evidence on the trial of exceptions to the commissioners' award, Heffner sought and was denied permission to refile his counterclaim. Following the court's ruling, counsel for Heffner then made an offer of proof which was rejected.

In ruling on the sufficiency of the counterclaim to state a claim, the principal opinion considers the offer of proof made by Heffner. In my view, this is not permissible. The counterclaim had been dismissed and there was no issue before the court relative to damage to the property preceding the date of filing of the commissioners' award. This was recognized by counsel for the Authority when he objected to the offer of proof and in so doing stated:

"Your Honor, rather than take up the Court's time, of course, it is entirely up to the discretion of the Judge, but since the counterclaim is not accepted by the Court and there is no issue in this proceeding about making an offer of proof, we don't accomplish anything. The question is a question of law. If on appeal Mr. Sleater is able to try his counterclaim, he will have to adduce his entire facts as to the counterclaim. The facts which he is going to show the Court today, really, will just take up the Court's time, because it is not in issue. It has been dismissed."

Heffner should not be denied a trial on his counterclaim on the basis that his offer of proof made after the court refused refiling of his counterclaim was deficient in some respect.

The principal opinion also takes into consideration allegations in the petition in condemnation in determining whether the counterclaim states a claim. It observes that according to the petition the Authority had to follow certain prescribed procedure which included seeking passage of an ordinance, entering into a contract with the city, seeking federal financial assistance, declaring the need to acquire the property in the project, and filing the petition in condemnation. The principal opinion concludes that these mere allegations are sufficient to refute the assertion in the counterclaim that the Authority stalled and delayed the filing of the condemnation petition and presumably cause the allegations of the counterclaim to fail to state a claim. The opinion further concludes that since § 99.420(11), RSMo 1959, V.A.M.S., provides for the Authority to furnish assistance in relocating families displaced by the project, it was not improper conduct for the Authority to contact families in order to assist them in relocating. It further notes that whereas the counterclaim states that the Authority enticed tenants to move, the offer of proof only said that the Authority had contacted five tenants and encouraged them to move, and did not recite when this occurred or when the tenants moved.

In my view, this reliance on allegations in the condemnation petition and on asserted insufficiency in the landowner's offer of proof does not provide a valid basis for holding that the counterclaim failed to state a claim. The fact that the Authority followed statutory procedure does not mean that the landowner's property was not damaged without compensation therefor by the Authority's actions, in violation of Article I, Section 26 of the Constitution of Missouri, 1945.[2] If Heffner should prove in a trial of his counterclaim that the Authority did exercise dominion over his property prior to condemnation and did contact ten-

2. For example, in City of St. Louis v. International Harvester Co., Mo., 350 S.W.2d 782 [3], the city had followed the provision of its Charter, but this court held Section 26 of Article I of the Constitution of Missouri, 1945, governed, and in that case the Charter provision was held unconstitutional.

ants and arrange to move them elsewhere, and that by its actions the property was *damaged* prior to the time when the commissioners' award in condemnation was filed, he would be entitled under the constitutional provision to be compensated for that damage. Whether Heffner could and would make the necessary proof should be determined in a normal trial on the counterclaim, not by an offer of proof made in a case in which the counterclaim is not a pleading and not by what the petition in condemnation alleges was the statutory procedure which the Authority was to follow. There is logic in a statutory provision providing for other places to live for those to be displaced, but if as a result the property is damaged, those losses should rest on the condemning Authority, not on the landowner whose land is being condemned.

I am impressed by the reasoning in the cases cited in the principal opinion which arose in Michigan, Ohio and New York. Some are by state courts and some by federal courts sitting in those states. They apply both state and federal constitutional provisions prohibiting the taking of private property for public use without just compensation. Without lengthening this dissent by a review and analysis of those cases, I note merely that they conclude that where the condemning authority by its actions causes depreciation in value of the property prior to a taking in the usual sense, the landowner is entitled to compensation therefor.

The principal opinion refers to these cases, particularly Foster v. City of Detroit, 254 F.Supp. 655, and City of Cleveland v. Carcione, 118 Ohio App. 525, 190 N.E.2d 52, 5 A.L.R.3d 891, as extreme cases and states that if such cases arise in Missouri, they will be dealt with on their facts. I cannot see any basis for conclud-

ing that these cases were extreme but that Heffner's case is not. The Detroit and Cleveland cases were tried and the court had the full facts. The landowner had a chance to develop fully what the city had done and how his property was damaged. Heffner has not had his day in court on this same issue. Even so, what is before us indicates that Heffner had eight tenants in his two four-apartment buildings when this plan was announced and filed. Each unit rented for $75.00 per month. The Authority filed its plan, conducted hearings, contacted the tenants about moving, and told Heffner they would be acquiring the buildings shortly and not to make improvements. The tenants began to move out and within approximately a year all the tenants were gone and no one else moved in. Annual rentals dropped from $7,200 to zero. The vacant buildings were vandalized. Their value dropped, just as occurred in the Detroit and Cleveland cases. This loss in value is recognized in the principal opinion when it states: "On this appeal, a major matter of contention is the bearing upon this case of the admitted depreciation in the condition of the property following the filing of the plan of renewal on September 17, 1964, and the payment of the commissioners' award, October 24, 1966." As a result of that depreciation, the Authority's witnesses valued the property as vacant lots, considering the buildings to be beyond economical repair. These facts, even without the elaboration which a trial would make possible, disclose a situation comparable in many respects to the cases which the principal opinion calls extreme and which it says "present situations in which the traditional rules of valuation fail to meet the constitutional requirements."

I would hold that the counterclaim does allege sufficient facts to entitle Heffner to a trial thereon and would reverse and remand for that purpose.