526 S.W.2d 354 (1975)
LAND CLEARANCE FOR REDEVELOPMENT AUTHORITY OF KANSAS CITY, Missouri, Plaintiff-Respondent,
v.
George MASSOOD and Donald E. Hutchison, Defendants-Appellants.
No. 27029.
Missouri Court of Appeals, Kansas City District.
August 4, 1975.
Gage, Tucker, Hodges, Kreamer, Kelly & Varner, William L. Turner, Michael J. Gallagher, Kansas City, for defendants-appellants.
Terrell, Van Osdol & Magruder, Paul Van Osdol, Jr., Richard M. Erickson, Kansas City, for plaintiff-respondent.
Before SOMERVILLE, P. J., PRITCHARD, C. J., and TURNAGE, J.
SOMERVILLE, Presiding Judge.
Land Clearance For Redevelopment Authority Of Kansas City, Missouri, hereinafter referred to as "condemnor", filed a condemnation action to acquire three parcels of land jointly owned by George Massood and Donald E. Hutchison, hereinafter referred to as "condemnees". The condemnees, as well as the condemnor, filed exceptions to the Commissioners' Report fixing and assessing $15,065.00 as condemnees' damages for the taking of the three parcels of land. The amount awarded by the Commissioners was paid into court on September 17, 1971.
A jury trial resulted in a verdict and judgment for $12,052.00 as damages for the taking of condemnees' property. Condemnees, dissatisfied with the jury's assessment of damages, have appealed and their effort to achieve appellant relief centers on *355 certain evidentiary matters. More precisely, condemnees claim the trial court committed reversible error on three occasions. First, in refusing to permit condemnees, during cross-examination of one of condemnor's expert witnesses, to inquire of said expert witness the consideration he gave, if any, to the impact of an "announcement and implementation" of an Urban Renewal Plan for the area on his "comparable sales data". Second, in overruling condemnees' motion in limine directed towards, and in admitting into evidence over condemnees' objection, the price paid by them for certain parcels of the land being condemned because the purchases resulted from "forced sales" rather than voluntary market transactions. Third, in overruling condemnee's motion in limine directed towards, and in admitting into evidence over condemnees' objection, all purported "comparable sales" testified to by condemnor's expert witnesses subsequent to announcement of the aforementioned Urban Renewal Plan and a declaration that the project area was blighted.
Before addressing condemnees' various contentions on appeal with any degree of particularity, some observation of certain general facts appears to be in order.
Condemnees' property was located in a portion of Kansas City, Missouri, described as the "East 23rd Street Urban Renewal Area", which, on June 15, 1967, was declared to be "blighted and unsanitary" by the City Planning Commission of Kansas City, Missouri. On August 18, 1967, the City Council of Kansas City, Missouri, passed an ordinance declaring the proposed urban renewal area blighted. Condemnor's plan for redevelopment of the area, as revised, was approved by the City Council on October 1, 1970, and the instant action to acquire condemnees' property by condemnation was filed July 12, 1971.
Condemnees were real estate brokers specializing in commercial and industrial property. Among other things, they specialized in assembling tracts of land (taking title in their own names) for speculative commercial and industrial purposes. In 1963, they assembled and sold to Sears, Roebuck and Company 168,242 square feet of property. Sears put the acquired property to use as a parking lot in connection with their "retail store" and "catalogue order plant" located at Truman Road and Cleveland in Kansas City, Missouri. In 1964, condemnees started to assemble another tract of ground for speculative purposes in what was subsequently designated the East 23rd Street Urban Renewal Area, and in so doing acquired the three parcels of land which are the subject of this condemnation action. The three parcels of land mentioned are located on the east side of Myrtle Street across from the Sears parking lot.
The condemnees and their expert witnesses all testified that the highest and best use of the three parcels of land, although zoned "R 2Bresidential duplexes" as of the date of taking, was for commercial and industrial purposes. They further testified that in their opinion there was a "reasonable probability" that the three parcels of land could be rezoned to "M 2Aheavy industrial". Condemnor's expert witnesses all testified that the highest and best use of the three parcels of land was for residential purposes.
One of the condemnees, without objection, testified that "it became public knowledge" in 1965 that the general area in which the three parcels of land were located was being studied and considered as a "blighted area" for purposes of "redevelopment" and when that occurred "everything just stopped".
As is frequently the case, there was a wide divergence of opinion between condemnees and their expert witnesses, and the opposing expert witnesses, as to the fair market value of the three parcels of land as of the date of their taking (September 17, 1971). The condemnees and their expert witnesses, as well as the opposing expert witnesses, all used the market data or comparable sales approach, as opposed to the cost approach or income approach, in arriving *356 at the fair market value of the property as of the date of taking. Opinions as to the fair market value of the property ranged from a high of $39,775.00 to a low of $5,125.00.
Considerable difficulty has been encountered in perceiving the thrust of condemnees' first assignment of error, due in part to the difficulty of relating it to any particular question or questions posed by condemnees on cross-examination. The assignment, verbatim, reads as follows: "The Court erred in refusing to permit appellants to inquire on cross-examination of respondent's expert witness into the consideration given, if any, to the impact of the announcement and implementation of the Urban Renewal Plan on the validity of his comparable sales data." Condemnees, in their brief, failed to point to any question or questions posed by them on cross-examination which they claim their first assignment of error purports to encompass. After carefully searching the record this court surmises that the gravamen of condemnees' first assignment of error lies in the following two questions propounded on cross-examination to one of condemnor's expert witnesses:
"And after Urban Redevelopment comes in you just can't make it commercial any more, can you?"

and
"But there couldn't be any parking lot over here where you have your comparable after Urban Renewal came in?"
Both of said questions were objected to by condemnor and its objections were sustained by the trial court. A literal construction of the questions indicates that they were directed toward the use condemnor intended to make of the property once acquisition was completed. Nevertheless, it is apparently condemnees' contention, after reconciling the questions with their first assignment of error and the argument portion of their brief, that said questions were an attempt on their part to show that "public knowledge" in 1965 that the general area was being studied and considered as a "blighted area for purposes of redevelopment" had a depressing effect on the market value of all property in the area, including the comparable sales relied on by condemnor's expert witnesses.
The prevailing law of this state fails to support the condemnees insofar as their first assignment of error is concerned. In St. Louis Housing Authority v. Barnes, 375 S.W.2d 144 (Mo.1964), the Supreme Court affirmed a lower court's refusal to give an instruction proffered by a property owner that the jury, in assessing damages in a condemnation action, could take into consideration ". . . any damages caused to defendant's property as a result of the institution of the condemnation proceedings, either by the actual filing of the condemnation petition or by the announcement of plans for condemnation and the effect of such announcement on the value of such property if you find that such announcement, if any, caused the property to change in value." Thus, the issue of whether the adverse effect of a premature announcement of condemnation is a proper element for a jury to consider in assessing damages in a condemnation action was squarely presented to the court in Barnes. In holding that it was not, the court relied on and quoted as follows from its en banc opinion in State ex rel. City of St. Louis v. Beck, 333 Mo. 1118, 63 S.W.2d 814, 817 (banc 1933): "We do not undertake to decide if the realty company is entitled to any damages on account of the pendency or delay of the condemnation proceeding itself, and if there is any damage on account of such proceedings, it is of a personal character, as distinguished from any damage to the property itself, and is not an element to be considered by the commissioners in assessing benefits and damages in this proceeding." In State ex rel. State Highway Commission v. Samborski, 463 S.W.2d 896, 902-903 (Mo.1971), a case involving a lessee's interest in a condemnation award, the Supreme Court demonstrated the continuing viability of the principle for which Barnes *357 and Beck have presently been cited: "It may be, as suggested by appellant's [lessee's] presentation, that `common knowledge' of the station's projected demise affected its value, but the threat of condemnation proceedings is not an element of damages for a taking in condemnation. St. Louis Housing Authority v. Barnes, Mo., 375 S.W.2d 144, 147; State v. Beck, Mo. 63 S.W.2d 814." The line of authorities just mentioned, and the principle announced therein, were relied on in State of Missouri ex rel. State Highway Commission v. Anderson, 485 S.W.2d 614 (Mo.App.1972). The principle enunciated in Beck and affirmed in Barnes stamps with approval the trial court's ruling in this case. If an adverse effect brought about by threatened condemnation can not be considered as an element of damages to the property subject to condemnation, then it would be illogical to hold that it could be indirectly placed before the jury by showing its effect on comparable sales utilized to demonstrate the fair market value of the property being condemned. Under the prevailing law of this state laid down by the Supreme Court, supra, which this court is obliged to follow, condemnees' first assignment of error is ruled against them.
Before leaving condemnees' first assignment of error, this court senses a growing awareness that the debilitating effect of threatened condemnation is a recurring problem that may well require a revisitation of the obtaining law in this state. In a given situation a premature announcement of condemnation may well cast a devastating pall over property in a given area with the end result that by the time a de jure taking occurs the fair market value of the property has become noticeably depressed. The present status of the law in this state, as exemplified by State ex rel. City of St. Louis v. Beck, supra; St. Louis Housing Authority v. Barnes, supra; State ex rel. State Highway Commission v. Samborski, supra, and State ex rel. Highway Commission v. Anderson, supra, undoubtedly springs from an unyielding commitment to the proposition that the fair market value of property subject to condemnation is to be ascertained as of the date of appropriation, i. e., the date the commissioners' award is paid into court. St. Louis Housing Authority v. Barnes, supra, and State ex rel. Highway Commission v. Anderson, supra. This latter rule apparently became clearly fixed in the law of this state as early as 1875. Hosher v. K. C., St. J. & C. B. R. Co., 60 Mo. 303. The rule had its inception at a time when the power of eminent domain was exercised in most instances to acquire raw, undeveloped land for public purposes and announcements of its impending exercise had a minimal impact, if any at all, on the value of the property subject to acquisition. Moreover, the rapid and widespread dissemination of news, which the multiple, sophisticated news media of today are capable of, was not then a factor to be reckoned with. A metamorphosis occurred between then and now. It now seems to be the rule rather than the exception for the power of eminent domain to be exercised in highly developed areas and when it is in the offing it becomes the news of the day and saturates broad areas. For these reasons, this state's present commitment to the de jure date of taking as controlling for determining the fair market value of property subject to condemnation may well be an anachronism. Although inadequately presented by the record in this case both by way of evidence and offers of proof, a grossly premature announcement of condemnation, however well motivated and regardless of how or by whom initiated, may, as a practical matter, penalize property owners if the fair market value of their property is determined solely as of the date of the de jure taking. This is particularly true in situations involving the twentieth century innovation of urban redevelopment. In Land Clearance for Redevelopment Authority v. Morrison, 457 S.W.2d 185 (Mo. banc 1970), the Supreme Court of this state suggested, at least inferentially, in a case involving condemnation for urban redevelopment purposes, that a property owner's only recourse *358 for the adverse effect of threatened condemnation was by way of an action for damages of a "personal character". Conversely, the case appears to say the adverse effect of threatened condemnation was not an element for jury consideration in assessing damages to property in a condemnation proceeding. Land Clearance for Redevelopment Authority v. Morrison, supra, l. c. 199, further suggests that the adverse effect of threatened condemnation must be accompanied by proof of "aggravated delay" or "untoward activity" on the part of the condemning authority in order to state a separate cause of action for damages of a "personal character". If condemning authorities are given the benefit of the doubt, it is difficult to envision a situation, unusual circumstances excepted, when a condemning authority could be said to be guilty of "aggravated delay" or "untoward activity" so far as a premature announcement of condemnation is concerned. Nevertheless, conceding for sake of argument that all premature announcements of condemnation emanate from the highest of motives, there is no escape from the harsh, cold reality that a grossly premature announcement of condemnation may depreciate the value of property to such an extent that the property owner is unfairly victimized if determination of the market value of his property is limited to the de jure date of expropriation. For this reason, some legal writers harbor serious reservations whether limiting the property owner to a separate action for damages of a "personal character", with its attendant restrictions, is realistic, and, if realistic, whether it is an adequate remedy. Nichol's, The Law of Eminent Domain, Revised Third Edition, Supplement, Vol. 4, pp. 57-75, a recognized treatise in the field of eminent domain, advances the doctrine of "condemnation blight" as "an avenue of relief" when a grossly premature announcement of condemnation has acted as a depressant on the fair market value of property subsequently appropriated. The doctrine of "condemnation blight" therein advanced is evidentiary in nature and the substance of the doctrine is stated as follows at page 58: "The problem of condemnation blight involves the question of the date as of which the property should be valued. Ordinarily, property taken by eminent domain is valued either as of the date that title vests in the condemnor as a matter of law or the date when the condemnor actually takes possession, whichever is earlier. The question of blight involves the use of an earlier date which will reflect the value of the property prior to the impact of the deteriorating influence to an immenent taking." The preceding dictum is not meant to "tout" the doctrine of "condemnation blight". It does, however, point up a prevalent awareness of a basic difficulty that property owners labor under so far as receiving just compensation for their property is concerned when a grossly premature announcement of a threatened condemnation, through no fault of theirs, noticeably reduces the value of their property before a legal taking occurs. The doctrine of "condemnation blight" may well be the answer to the vexing problem that presently exists in this state under certain circumstances and it is not incompatible with the constitutional mandate (Article I, Sec. 26, Constitution of Missouri, 1945, V.A.M.S.) "[t]hat private property shall not be taken . . . for public use without just compensation."
The court focuses attention on condemnees' third assignment of error before addressing their second assignment, since condemnees' first and third assignments of error are, in theory, closely related. The essence of condemnees' third assignment of error is that the trial court should have excluded all comparable sales relied on by condemnor's expert witnesses that occurred after 1965, the date condemnees claim that it became "public knowledge" that the area was being considered for urban redevelopment purposes. The gist of their argument is that the aforesaid had a deleterious effect on the fair market value of all property in the area from 1965 on and therefore all sales subsequent to that time were so tainted that they should have been per se excluded *359 from the jury's consideration. No rational distinction can be drawn between the legal propriety of not permitting condemnees to cross-examine condemnor's expert witness on the adverse effect of threatened condemnation with respect to the comparable sales he utilized in his market data approach in determining the fair market value of condemnees' property and a per se exclusion of all sales subsequent to 1965 for use as comparable sales. If logic supports the view that it was improper for the condemnees on cross-examination of condemnor's expert witness to delve or probe into the adverse effect of threatened condemnation on the validity of the comparable sales he utilized, then the same logic compels the conclusion that all comparable sales subsequent to 1965 should not be per se excluded as contended by condemnees. Condemnees' third assignment of error does not evolve from a claim that the comparable sales subsequent to 1965 utilized by condemnor's expert witness were forced sales. Their third assignment of error is predicated solely on the proposition that all comparable sales subsequent to 1965 should have been excluded on a wholesale basis solely because of the purported adverse effect of threatened condemnation. The cases cited, supra, supportive of affirmance of the trial court's rulings under attack in condemnees' first assignment of error, likewise disavow the efficacy of their third assignment of error. Additionally, the Supreme Court of this state, as early as 1922, held in Kansas City v. Boruff et al., 295 Mo. 28, 243 S.W. 167 (banc) that sales of property subsequent to a public announcement of condemnation, but prior to the de jure date of taking, could properly be used as comparable sales in a condemnation action. In doing so, the court distinguished sales to third parties from those made to condemning authorities during the mentioned time frame. At a somewhat later date, in State ex rel. State Highway Commission v. Rauscher Chevrolet Company, 291 S.W.2d 89 (Mo.1956), the Supreme Court held that the price paid by an ultimate condemnee for property subject to condemnation, where the transaction occurred subsequent to the announcement of a proposed project, but during the pendency of the condemnation action, was admissible. Boruff and Rauscher Chevrolet Company buttress the conclusion reached by this court that sales of property subsequent to 1965 utilized by condemnor's expert witnesses as comparable sales were not per se excludable.
The pivotal issue in the remaining assignment of error, condemnees' second assignment in numerical order of assertion, is whether their acquisition of certain parcels of land subsequently condemned resulted from forced sales thereby rendering evidence of their purchase price inadmissible. The parcels of land in question are two in number and events leading up to their sale to and purchase by the condemnees, germane to the issue raised, are as follows: The first of the two parcels of land involved a renter of condemnees by the name of Sam Withers. Withers "outgrew" a house he had been renting from condemnees and moved to another residence which he was purchasing from a different owner under a "contract for a deed". Withers got behind on the scheduled payments in the "contract for a deed", and desired to move to and buy another home which was offered for sale by the Veterans Administration for $450.00. Condemnees suggested to Withers that he should obtain a deed to the property which he was purchasing under the "contract for a deed" and, in return, give the owner a note and deed of trust to secure any unpaid balance on the original purchase price. Withers acceded to condemnees' suggestion and the owner of the property was apparently amenable to completing the sale of the property to Withers as suggested by the condemnees. Prior to securing a deed from the owner of the property, condemnees had loaned Withers approximately $500.00 for various purposes. After Withers acquired title to the property he had been purchasing under the "contract for a deed", he then transferred title to the property to condemnees by warranty deed. As consideration *360 for the warranty deed from Withers the condemnees forgave the $500.00 they had previously loaned to him and, additionally, gave him $450.00 to buy the property offered for sale by the Veterans Administration and assumed payment of the remaining balance, approximately $1,600.00, owed on the property which he had deeded to them. There was not one scintilla of evidence in the record that the previous owner and subsequent holder of the deed of trust concerning the property in question ever threatened to dispossess Withers while the property was subject to the "contract for a deed" or to initiate foreclosure proceedings after the property became subject to the deed of trust. As previously noted, condemnees were actively engaged in the acquisition of property in the area for speculative purposes. The record discloses that their mode of operation in assembling tracts of land was to contact property owners in an area in which they were interested in and solicit acquisition of their property. The second of the two parcels of land involved was owned by Mrs. Quila Smith. This property was subject to a deed of trust to secure certain indebtedness incurred by Mrs. Smith, the remaining unpaid balance of which amounted to approximately $1,000.00. Mrs. Smith no longer occupied the property and lived in another part of the city. The property was unoccupied when the condemnees purchased it and Mrs. Smith's "mortgage payments" had apparently been delinquent for some time. An inference may be drawn from the evidence that Mrs. Smith had abandoned the property in question. The condemnees purchased the note, or notes, secured by the deed of trust on the Smith property and, after doing so, sought out Mrs. Smith and obtained a warranty deed from her for $500.00 and cancellation of the indebtedness. There is no evidence whatsoever that the prior holder of the note, or notes, ever threatened Mrs. Smith for foreclosure.
The general rule in this state bearing on the issue at hand is stated in the oft-cited case of State ex rel. State Highway Commission v. Rauscher Chevrolet Company, supra, l. c. 92: "It is the established rule in this state, and generally, that the price an owner paid for property being condemned is admissible as some evidence of its value at the time of appropriation. That rule applies unless circumstances appear which destroy the relevancy or probative value of that otherwise relevant and highly important evidence." The court properly cautioned that in order for the purchase price to be admissible, the underlying sale "must have been voluntary in the sense that the seller and buyer were each capable and desirous of protecting his interest" rather than a "forced sale". Concomitantly, admissibility of the price paid by an owner for property being condemned is relegated to the discretion of the trial court and, unless the purchase price is totally lacking in probative value, the weight to be given to it, insofar as being indicative of the condemned property's fair market value, is a recognized jury prerogative. State ex rel. State Highway Commission v. Crain, 496 S.W.2d 867 (Mo.App.1973), and cases therein cited. The trial court's decision to admit or refuse such evidence, since it falls within the realm of discretion, should not be disturbed on appeal absent a clear showing that the trial court manifestly abused its discretion. Epperson v. Nolan, 452 S.W.2d 263[9] (Mo.App.1970); and Union Electric Company v. Turner, 446 S.W.2d 430[7] (Mo.App.1969).
It is now appropriate to juxtapose the purchases from Withers and Smith with the principles immediately heretofore iterated. After doing so, it is the opinion of this court that the price paid by condemnees for the Smith property ($500.00 cash for her equity in the property and cancellation of approximately $1,000.00 indebtedness owed by her against the property) was clearly admissible. Condemnees sought Mrs. Smith out and she agreed to sell and the condemnees agreed to buy the property on the terms mentioned. Condemnees' initial contact with Mrs. Smith *361 was motivated by a desire to negotiate a purchase of the property from her. Although the evidence indicated that Mrs. Smith was delinquent in her payments regarding the indebtedness secured by the deed of trust on the property, the evidence also clearly disclosed that condemnees' initial contact with Mrs. Smith was motivated by a desire to negotiate a purchase of the property from her, not to threaten foreclosure. Since she had apparently abandoned the property, it may fairly be said that a sale of the property was consummated between a willing seller and a willing purchaser. Regarding purchase of the Withers property, although it may be said to have been infused with aspects rendering admissibility of its purchase price somewhat marginal or borderline, the trial court obviously concluded that Withers was motivated by a desire to acquire funds to purchase the property being offered by the Veterans Administration and seized upon an opportunity presented to him by condemnees to rid himself of indebtedness and to acquire a place to live in that was unencumbered. So viewed, this court is unwilling to brand the trial court with an abuse of discretion in admitting the price paid by condemnees for the Withers property ($950.00 for his equity in the property and cancellation of approximately $1,600.00 indebtedness owed by him against the property). It is worthy of mention that condemnees at no time claimed that the nature and quality of the improvements on either the Smith or Withers properties were comparable to the nature and quality of the improvements on other improved properties which they relied upon as comparable sales. Condemnees were given free rein to place before the jury all relevant facts surrounding their purchase of the Smith and Withers properties and it was up to the jury to weigh the prices paid by condemnees, and the facts surrounding the purchases, in the broad spectrum of all the evidence introduced relative to the fair market value of the properties. Since there was evidence to support the Smith and Withers sales as being voluntary transactions, and condemnees were allowed to freely explain the circumstances under which the purchases were made, the trial court did not abuse its discretion in admitting the price paid by condemnees for the respective properties. In any event, the evidence was such that it immunized the trial court's admission of both of the respective purchase prices from being stigmatized as a manifest abuse of discretion. Having determined that none of the complained of evidentiary rulings by the trial court rose to reversible heights, the judgment below is accordingly affirmed.
Judgment affirmed.
All concur.