NATIONAL BY-PRODUCTS, INC. *v.* CITY of LITTLE
ROCK, by and through the Little Rock Regional Airport
Commission

95-807                                    916 S.W.2d 745

Supreme Court of Arkansas
Opinion delivered March 11, 1996

620

*Skokos, Bequette, & Smith,* by: *Michael G. Smith,* for appellant.

*Jerome Green & Associates,* for appellee.

BRADLEY D. JESSON, Chief Justice. The appellant, National By-Products, Inc. ("National"), filed a suit for inverse condemnation against the appellee, City of Little Rock, acting through the Little Rock Regional Airport Commission ("Commission"). National owns property near the airport on which it operates an animal by-products rendering plant. In its complaint and amended complaint, National claimed that the Commission's plans to expand a runway through its property amounted to a "taking" in violation of the Fifth Amendment to the United States Constitution and Ark. Const. art. 2, § 22. National appeals from the trial court's dismissal of its case for failure to state facts upon which relief could be granted. We affirm.

The facts as set out in National's complaint and amended complaint are as follows. National operates its plant at 4300 East 9th Street in Little Rock, and also owns an adjacent vacant parcel. Both the plant and the vacant parcel are located between the north end of the airport's runway and the south bank of the Arkansas River. According to National, its property was identified in a 1985 study as a necessary acquisition for noise mitigation purposes.

In 1991, the Commission acquired substantial property at the north end of Runway 4L-22R as a part of a noise mitigation and runway protection zone. National attached a map to its complaint showing these acquisitions. According to National, its property was the only non-residential improvement in this area. While Federal Aviation Administration (FAA) funds for the project were approved, the grant was not large enough to enable the Commission to acquire National's property.

The Commission announced its decision to proceed with the acquisition project in August of 1992 and had National's property appraised. It acquired the residential properties in the area and removed the improvements therefrom. According to National, the effect of these surrounding acquisitions left its

property an "island," as it became the sole property in the immediate vicinity that had not been acquired by the Commission.

According to National, the acquisition of its property remained a high priority for the Commission, as it is practically impossible to extend the runway to the south. The Commission's pre-application for funds for the acquisition of National's property remains on file with the FAA. National attached a copy of an official Commission map showing the intended runway extension, which, in addition to mitigating noise, is necessary for reducing current weight restrictions on aircraft, increasing capabilities of non-stop flights, and installing specialized landing and lighting systems.

Between late 1993 and early 1994, the Commission prepared a Capital Improvement Plan for the years 1995 through 1997. The two priority items in the plan were the extension of the runway and the installation of the landing and lighting systems. According to National, the Commission has publicly announced, through the news media, the filing and recording of maps, and the adoption of resolutions, its plans to install the landing and lighting systems in the vicinity of National's property. As part of this plan, the Commission applied to the FAA for permission to impose a $3.00 per passenger facility charge, the proceeds of which would be used to retire revenue bonds to fund the project. An approved layout plan is on file with the FAA.

According to National, its business is capital intensive and requires frequent maintenance to keep equipment in good working order. National alleges that substantial expenditures, including the purchase and installation of new equipment, would be made at great risk due to the uncertainty as to whether these costs could be recovered in subsequent litigation or by agreement with the Commission.

In 1989, National's competitors approached National's suppliers and informed them of newspaper articles about the proposed runway extension. As the suppliers are required by law to dispose of inedible animal by-products promptly, National's competitors were able to convince a number of National's customers to change rendering services. According to National, pro-

spective purchasers of National's business, once informed of the proposed airport expansion, have immediately lost interest in buying the company. Additionally, National has had extreme difficulty in retaining its management and employees.

In sum, National alleges it has suffered material harm to its operations to the extent that it has been substantially deprived of the use and enjoyment of its property. As a result of the Commission's actions, which have "effectively frozen [its] operation and have depressed land values," National claims that its property has been rendered unfit for its highest and best commercial use. National further claims that the Commission's actions have resulted in permanent and substantial interference and deprivation amounting to an actual or constructive taking in violation of the Fifth Amendment to the United States Constitution and Ark. Const. art, 2, § 22. National has asked for the fair market value of its property from the date the taking was effective. In its original complaint, National claimed that this amount is in excess of the $559,600.00 appraisal figure obtained by the Commission.

The Commission filed a motion to dismiss, asserting that National had failed to assert facts constituting actual trespass or a physical taking under Arkansas law, and that National had made no showing of total diminution in the value of its property. National filed a response to the motion, claiming that it need only demonstrate that the Commission acted in a manner that substantially diminished the value of its property. The trial court heard arguments from counsel at a hearing on the motion, but no evidence or witness testimony was presented. At the conclusion of the hearing, the trial court ruled that the adverse impact on the commercial use of National's property appeared to be caused by its competitors rather than the direct result of the Commission's actions. In determining that National's complaint did not state a cause of action, the trial court further observed that the law in Arkansas on inverse condemnation has historically involved some type of invasion or trespass where governmental activities interfere substantially with the quiet enjoyment of the subject property or diminish its commercial use. The trial court subsequently entered a judgment of dismissal pursuant to Ark. R. Civ. P. 12(b)(6), from which National takes this appeal.

When reviewing an order granting a motion to dismiss

to determine whether dismissal was proper, we treat the allegations in the pleading as true and view those allegations in a light most favorable to the appellant. *Mann* v. *Orrell*, 322 Ark. 701, 912 S.W.2d 1 (1995).

Article 2, section 22 of the Arkansas Constitution provides that "[t]he right of property is before and higher than any constitutional sanction; and private property shall not be taken, appropriated or damaged for public use, without just compensation therefor." We have interpreted this provision to require compensation for a taking when a municipality acts in a manner which substantially diminishes the value of a landowner's land, and its actions are shown to be intentional. *Robinson* v. *City of Ashdown*, 301 Ark. 226, 783 S.W.2d 53 (1990). A conspectus of the law on inverse condemnation is as follows:

> As originally conceived and developed, the concept of inverse condemnation was a remedy for physical taking of private property without following eminent domain procedures. "Fault" has nothing to do with eminent domain, and it is not bare trespass or negligence which results in inverse condemnation but something which amounts to a de facto or common law "taking." J. Sackman & P. Rohan, *Nichols on Eminent Domain*, 8.1[4] (Rev. 3d ed. 1985, Supp. 1987). Inverse condemnation is thus a cause of action against a governmental defendant to recover the value of property which has been taken in fact by a governmental entity although not through eminent domain procedures.

301 Ark. 226 at 230. In *Robinson*, we stated that a taking occurs when a condemnor acts in a manner which substantially diminishes the value of a landowner's land, and that a continuing trespass or nuisance could ripen into inverse condemnation. Later, in *City of Fayetteville* v. *Stanberry*, 305 Ark. 210, 807 S.W.2d 26 (1991), while we did not provide a definitive statement of what constitutes a taking, we emphasized that a taking does not require permanency nor an irrevocable injury. 305 Ark. 210 at 214-215; *citing First English Evangelical Lutheran Church* v. *County of Los Angeles*, 482 U.S. 304 (1987).

At least one commentator has characterized the issue presented in this case as one involving "condemnation blight,"

which is defined as "the debilitating effect upon value of a threatened, imminent or potential condemnation." 4 J. Sackman, *Nichols on Eminent Domain*, § 12B.17[6] (Rev. 3d ed. 1995). The following discussion is illustrative:

> The question has arisen with more and more frequency, usually in the format of an action in inverse condemnation: Absent a "taking" in the legal and traditional sense, does "condemnation blight" give rise to a cause of action for the recovery of the diminution in property value, lost rental income and increased and unrequited costs of maintenance of protection of property? Several jurisdictions require a physical taking or legal restraint as a *sine qua non* to a sustainable cause of action. Other jurisdictions, recognizing the economic impact, have equated condemnation blight with a de facto taking. However, it has been held that damages for loss of business and depreciation of property resulting from the condemnation of adjacent land are noncompensable where there is no interference with possession, use, or enjoyment of such land.

*Id.* at 12B-256-258 [footnotes omitted].

■ In *Danforth v. United States*, 308 U.S. 271 (1939), a landowner contended that the "taking" of his property had occurred prior to the institution of condemnation proceedings, by reason of the enactment of the Flood Control Act. He claimed that the passage of the Act had diminished the value of his property because the plan embodied in the Act required condemnation of a flowage easement across his property. The United States Supreme Court held that, in the context of condemnation proceedings, a taking does not occur until compensation is determined and paid:

> A reduction or increase in the value of property may occur by reason of legislation for or the beginning or completion of a project. Such changes in value are incidents of ownership. They cannot be considered as a 'taking' in the constitutional sense.

482 U.S. 271 at 285. *See also Agins v. City of Tiburon*, 447 U.S. 255 (1980)(a municipality's good-faith planning activities, which did not result in successful prosecution of an eminent domain

claim, did not so burden landowners' enjoyment of their property as to constitute a taking).

■ We followed the rationale of the *Danforth* decision in *Hood* v. *Chadick, County Judge*, 272 Ark. 444, 615 S.W.2d 357 (1981); *see also* 4 J. Sachman, *Nichols on Eminent Domain* § 12B.17[6] (Rev. 3d ed. 1995). In that case, Hood appealed from the trial court's dismissal of his case against Jefferson County for damages he alleged were caused by the county's threat to take his property. Hood owned a building registered as a historical landmark located across the street from the Jefferson County Courthouse. After the courthouse burned in 1976, a commission was appointed to discuss plans for rebuilding. The commission's members considered plans to take Hood's property for parking and landscaping. The original plan, approved by the City Council in 1978, was withdrawn from a November 1978 election. A subsequent plan was developed and referred to the people in a July 1979 election. The plan was defeated. Subsequently, the county dismissed its condemnation suit against Hood, which had been filed in response to Hood's suit to enjoin the county judge from taking his property and for damages for loss of rentals. In affirming the trial court's dismissal of Hood's case, we observed that the county never took possession or even entered upon Hood's property and concluded that "[n]o damages are allowable for a mere 'threat to condemn.' " *Id*. at 447; *see also Watson* v. *Harris*, 214 Ark. 349, 216 S.W.2d 784 (1949); *Southwestern Water Co.* v. *Merritt*, 224 Ark. 499, 275 S.W.2d 18 (1955)(holding that the actual taking or damage of lands for public use is what must be compensated under the state and federal constitutions, not a plan to take or damage the land).

■ Our holding in *Hood* is consistent with the law in several jurisdictions which adhere to the general rule that mere plotting or planning in anticipation of an improvement does not constitute a taking or damaging of the property affected where the government has not imposed a restraint on the use of the property. *See e.g., Westgate Ltd.* v. *State*, 843 S.W.2d 448 (Tex. 1992) and *Lone Star Ind.* v. *Sec. of Kan. Dept. of Transp.*, 671 P.2d 511 (Kan. 1983) (citing with approval *Hood* v. *Chadick, supra*); *see also* J.R. Kemper, Annotation, *Plotting or Planning in Anticipation of Improvement as Taking or Damaging of Property Affected*, 37 A.L.R.3d 127 (1971 and Supp. 1995).

■ As outlined in *Westgate, Ltd.* v. *State, supra*, public policy considerations support our continued adherence to the general rule:

> Construction of public-works projects would be severely impeded if the government could incur inverse condemnation liability merely by announcing plans to condemn property in the future. Such a rule would encourage the government to maintain the secrecy of proposed projects as long as possible, hindering public debate and increasing waste and inefficiency. After announcing a project, the government would be under pressure to acquire the needed property as quickly as possible to avoid or minimize liability. This likewise would limit public input, and forestall any meaningful review of the project's environmental consequences. The government would also be reluctant to publicly suggest alternative locations, for fear that it might incur inverse condemnation liability to multiple landowners arising out of a single proposed project. Failing to consider available alternatives is not only inefficient, but is at odds with proper environmental review.

843 S.W.2d 448 at 453 (citations omitted). As we recognized in *Hood*, these policy reasons might not be applicable where a condemning authority is accused of intentionally injuring a landowner. However, as conceded by counsel for National during oral argument, the Commission, through its actions, did not manifest such an intent to cause injury.

■ In this case, the property in question continued to be used for its traditional purpose as a rendering plant. Neither the City nor the Commission has placed any direct restraint on that use. Likewise, there is no allegation that the City or the Commission acted in bad faith in its dealings with the landowner. It is clear that, on the facts before us, any damages sustained by National were insufficient to support an action for inverse condemnation. When viewing the allegations in the amended complaint in a light most favorable to National, it cannot be said

628

that the Commission's actions constituted a taking of National's property.

Affirmed.