**CLAY COUNTY REALTY COMPANY and Edith Investment Company, Appellants,**

v.

**CITY OF GLADSTONE, Respondent.**

No. SC 88924.

Supreme Court of Missouri, En Banc.

June 10, 2008.

Michael J. Abrams, R. Kent Sellers, Lathrop & Gage, L.C., Kansas City, for Appellants.

Robert O. Jester, Samuel G. MacRoberts, Kansas City, for Respondent.

MARY R. RUSSELL, Judge.

The issue presented in this appeal is whether Missouri recognizes a cause of action for precondemnation damages when the condemning authority is alleged to have caused undue delay and committed untoward acts in implementing condemnation proceedings.

Clay County Realty Company and Edith Investment Company ("Property Owners") brought suit against the City of Gladstone ("the City"), alleging that the City had unlawfully taken their property without just compensation. Property Owners appeal after the trial court found there were no genuine issues of material fact in dispute and summary judgment was entered against them. This Court has jurisdiction pursuant to Missouri Constitution article V, section 10, as the case was taken on transfer after disposition by the court of appeals. The judgment is reversed, and the case is remanded.

## I. Background

Property Owners own a retail building, Gladstone Plaza Shopping Center ("property"). The property was declared blighted by the City in May 2003 under the provisions of chapter 353, RSMo 2000, and where amended RSMo Supp.2007.[1] In May 2004, the City entered a redevelopment agreement with a developer, but by August 2005 it had withdrawn its designation of the developer and cancelled the agreement. Starting in August 2005, the City also began to solicit tax increment financing ("TIF") proposals for the property pursuant to the provisions of Missouri's

---

1. All statutory references are to RSMo 2000, unless otherwise indicated.

Real Property Tax Increment Allocation Redevelopment Act ("TIF Act"), sections 99.800 to 99.865, RSMo 2000, and where amended RSMo Supp.2007. The City, in October 2005, adopted another ordinance designating the property as blighted under the TIF Act and approved a TIF plan[2] for the property. The approved TIF plan provides for the use of eminent domain for economic development. To date, however, the City has never adopted an ordinance approving a TIF project[3] specifying the redevelopment to occur at the property.

Section 99.810.1(3) provides in pertinent part:

[N]o ordinance approving a redevelopment project shall be adopted later than ten years from the adoption of the ordinance approving the redevelopment plan under which such project is authorized and provided that no property for a redevelopment project shall be acquired by eminent domain later than five years from the adoption of the ordinance approving such redevelopment project.[4]

The City has never completed formal condemnation proceedings against the property, but Property Owners admit that, because the City has not approved a TIF project ordinance for the property, the City is not yet under the five-year time limitation for acquiring the property established by section 99.810.1(3).

Although there are no allegations in this case that the City has violated the applicable statutory time provisions, Property Owners contend that the City has engaged in undue delay and untoward activity in implementing condemnation proceedings against the property. They allege that the City has failed to timely proceed with redevelopment and failed to find an adequately capitalized developer. They allege that, as a consequence of the City's actions, numerous retail tenants have not renewed leases at the property. They also argue that the City has harassed them with inspections and code violations and interfered with their ability to attract new tenants.

Property Owners brought suit against the City, alleging a violation of Missouri Constitution article I, section 26, because the City's actions caused "significant diminution of the value of the [p]roperty, and the City has thereby taken the [p]roperty for public use or purpose." Their suit also alleges that the City's actions have caused them consequential damages for increased operating costs and for lost rental and lease income due to their inability to secure new tenants or to renew or extend existing leases. They contend that their consequential damages are ongoing.

---

**2.** Section 99.805(13), RSMo Supp.2007, defines a TIF "redevelopment plan" as:

the comprehensive program of a municipality for redevelopment intended by the payment of redevelopment costs to reduce or eliminate those conditions, the existence of which qualified the redevelopment area as a blighted area, conservation area, economic development area, or combination thereof, and to thereby enhance the tax bases of the taxing districts which extend into the redevelopment area.

**3.** Section 99.805(14), RSMo Supp.2007, defines a TIF "redevelopment project" as: "any development project within a redevelopment

area in furtherance of the objectives of the redevelopment plan; any such redevelopment project shall include a legal description of the area selected for the redevelopment project."

**4.** *See also* section 523.274.2, RSMo Supp. 2007 (providing that in TIF condemnation proceedings "[n]o action to acquire property by eminent domain within a redevelopment area shall be commenced later than five years from the date of the legislative determination ... that the property is blighted .... [h]owever, such determination may be renewed for successive five-year periods by the legislative body").

The City moved for summary judgment, alleging that Property Owners' suit was not ripe and had failed to state a claim for an unconstitutional "taking." Judgment was entered in the City's favor, and Property Owners appeal.

## II. Standard of Review

■ Appellate review of summary judgment is *de novo*. *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). Summary judgment is appropriate where the moving party has demonstrated, on the basis of facts as to which there is no genuine dispute, a right to judgment as a matter of law. *Id.* A "genuine issue" that will prevent summary judgment exists where the record shows two plausible, but contradictory, accounts of the essential facts and the "genuine issue" is real, not merely argumentative, imaginary, or frivolous. *Id.* at 382. This Court reviews the record in the light most favorable to the party against whom judgment was entered. *Id.* at 376. The movant bears the burden of establishing a legal right to judgment and the absence of any genuine issue of material fact required to support the claimed right to judgment. *Id.* at 376–81.

## III. Actions for "takings" and related damages

■ Property Owners' claims include that the City's actions and inactions following its blight declaration for the property resulted in a de facto taking that violates Missouri Constitution article I, section 26, which provides that "private property shall not be taken or damaged for public use without just compensation." "While the mere declaration of blight and other initial

steps authorizing condemnation, even if they result in a decline in property values, do not constitute a taking requiring compensation to the property owner ... governmental action short of acquisition or occupancy may constitute a constructive or de facto taking." *Thomas W. Garland, Inc. v. City of St. Louis*, 596 F.2d 784, 787 (8th Cir.1979) (internal citations and quotations omitted) (discussing a takings claim alleging property damages and lost rental income suffered after a blight declaration; finding that "physical invasion or appropriation of the property" is not essential to a claim of de facto condemnation; stating that "[t]o constitute a taking ... it is sufficient if the action by the government involves a direct interference with or disturbance of property rights").

■ "When a taking occurs, the owner 'is entitled to be put in as good a position pecuniarily as if his property had not been taken.'" *Akers v. City of Oak Grove*, 246 S.W.3d 916, 919 (Mo. banc 2008) (quoting *Olson v. United States*, 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236 (1934)). "This concept encompasses both direct takings, wherein the government formally takes land for public use via eminent domain, and inverse takings, where the government takes or damages land, sometimes unintentionally, without going through an official process." *Id.*[5]

■ Traditionally, actions for inverse condemnation provide a landowner a remedy when a condemnor physically accomplishes a taking or damaging of private property without completing the procedural or compensatory requirements of a regular eminent domain action. *State ex rel. Chiavola v. Vill. of Oakwood*, 931 S.W.2d 819, 824 (Mo.App.1996) (discussing a claim

**5.** In *Akers,* property owners filed an inverse condemnation action against a city after its sewer system overflowed, thereby causing ex-

tensive damage to the owners' properties and resulting in them losing rental income.

by plaintiffs that they suffered inverse condemnation because they were deprived of all economically viable use of their property and deprived of reasonable, investment-backed expectations). Inverse condemnation does not require the landowner to show a physical taking where an invasion or appropriation of a valuable property right that caused an injury can be shown. *Id.* (noting that police power actions that limit use of private property can sometimes constitute a de facto exercise of eminent domain; and citing *Roth v. State Highway Comm'n,* 688 S.W.2d 775, 778 (Mo.App.1984), wherein a claim for inverse condemnation was based on alleged aggravated delay by the condemnor coupled with a conditional offer).

"[I]t is not uncommon for a lengthy period of time to elapse between the time when the area is declared blighted by the legislative body and the time when the property is taken for condemnation purposes[, and] [b]etween the time of blighting and the time of taking, the property frequently has substantially deteriorated in value at great loss to the landowner." *State ex rel. Washington Univ. Med. Ctr. Redevelopment Corp. v. Gaertner,* 626 S.W.2d 373, 375–76 (Mo. banc 1982). The damages suffered when a "cloud of condemnation" hangs over a property and an actual taking is never effectuated or is long-delayed have been labeled as "condemnation blight." Dale A. Whitman, *Eminent Domain Reform In Missouri: A Legislative Memoir,* 71 Mo. L.REV. 721, 757 (2006). Condemnation blight can be marked by departure of rental tenants, unmarketability, and declines in rentability, capital values, and profits. *Id.*

The first Missouri case discussing the concept of condemnation blight was *Land Clearance for Redevelopment Authority of Kansas City v. Massood,* 526 S.W.2d 354, 356–58 (Mo.App.1975) (rejecting property owners' complaints about how their condemnation damages were calculated, but stating in dicta that adoption of the doctrine of condemnation blight could aid in providing just compensation in condemnation actions).[6] *Massood* discussed the court's "growing awareness that the debilitating effect of threatened condemnation is a recurring problem" because "[i]n a given situation a premature announcement of condemnation may well cast a devastating pall over property in a given area with the end result that by the time a de jure taking occurs the fair market value of the property has become noticeably depressed." *Id.* at 357.

Several jurisdictions recognize claims for condemnation blight under a theory of inverse condemnation. Whitman at 757. Cases recognizing such actions include: *Reichs Ford Road Joint Venture v. State Roads Commission of the State Highway Administration,* 388 Md. 500, 880 A.2d 307, 319–20 (2005) (holding that a property owner was entitled to seek compensation in inverse condemnation action for lost rental income and costs of maintaining property caused during 14–year delay in condemnation proceedings); *Johnson v. City of Minneapolis,* 667 N.W.2d 109, 115–116 (Minn.2003) (finding that city's precondemnation activities constituted a taking under the state's constitution); *State ex rel. Dep't of Transportation v. Barsy,* 113 Nev. 712, 941 P.2d 971, 976 (1997) (recog-

6. This Court first used the term "condemnation blight" in *Tierney v. Planned Industrial Expansion Authority of Kansas City,* 742 S.W.2d 146, 154 (Mo. banc 1987) (finding against the plaintiff's claim for condemnation blight because there were insufficient facts to show there had been an unconstitutional taking and noting that damages for the alleged taking would not be capable of determination until after a final condemnation award was entered).

nizing a right to recover damages caused by precondemnation activity when extraordinary delay or oppressive conduct by the condemnor has been shown), *overruled on other grounds by GES, Inc. v. Corbitt,* 117 Nev. 265, 21 P.3d 11 (2001); *Lincoln Loan Co. v. State Highway Commission,* 274 Or. 49, 545 P.2d 105, 109–10 (1976) (recognizing a cause of action in inverse condemnation for seeking recovery of alleged condemnation blight damages); *Conroy–Prugh Glass Co. v. Dep't of Transportation,* 456 Pa. 384, 321 A.2d 598, 602 (1974) (recognizing a remedy for a de facto taking where the property owner alleged precondemnation damages); *Klopping v. City of Whittier,* 8 Cal.3d 39, 104 Cal.Rptr. 1, 500 P.2d 1345, 1350–51, 1355, 1360 (1972) (discussing availability of damages for decline in property value caused by "condemnation cloud" resulting after announcement of intent to condemn; noting plaintiff should show unreasonable delay or conduct in addition to diminution of property values; recognizing a plaintiff's claim for inverse condemnation based on lost rents following a precondemnation announcement); *Luber v. Milwaukee County,* 47 Wis.2d 271, 177 N.W.2d 380, 384 (1970) (finding that alleged precondemnation damages for loss of rental income deserved compensation un-

der the "just compensation" provision of the state's constitution); and *City of Detroit v. Cassese (In re Elmwood Park Project Section 1, Group B),* 376 Mich.311, 136 N.W.2d 896, 900 (1965) (recognizing that where condemnation proceedings are protracted the whole character of an area may be changed to the detriment of the property owner and, if an area has been made a wasteland by the condemning authority, the property owner should not suffer the reduced value of his property).[7] But, this Court has previously rejected claims alleging damages resulting from condemnation blight.

In *State ex rel. Washington University Medical Center Redevelopment Corp. v. Gaertner,* a property owner claimed he suffered an unlawful taking in violation of Missouri Constitution article I, section 26, because the city's blight designation on his property had put it under a "cloud of condemnation" during the period the property was declared blighted, but was not yet under an order of condemnation. 626 S.W.2d at 374–75.[8] In dicta,[9] *Washington University* rejected the owner's argument that he had suffered an unconstitutional taking. *Id.* at 377–78. *Washington University* stated that a blighted property

**7.** But see *Nat'l By–Products, Inc. v. Little Rock Reg'l Airport Comm'n,* 323 Ark. 619, 916 S.W.2d 745, 748–49 (1996) (finding that there was not an unconstitutional taking due to condemnation blight where allegations of damages were for diminution of property value and lost rental income, but not for interference with possession, use or enjoyment of the property); *State v. Hewett Prof'l Group,* 321 Or. 118, 895 P.2d 755, 763–64 (1995) (refusing to find condemnation blight where the plaintiff's damages were the result of his own actions rather than the government's); *DUWA, Inc. v. City of Tempe,* 203 Ariz. 181, 52 P.3d 213, 218 (App.2002) (refusing to recognize a claim for a de facto taking where the property owner failed to show that the condemnor physically invaded its property or exercised dominion or control over it).

**8.** Similar to Property Owners' claims in this case, the property owner in *Washington University* alleged damages based on relocation or non-renewal by his lessees, discouraged market activity, vandalism, and his inability to rent the property. 626 S.W.2d at 375. He sought damages calculated by the reasonable rental value of his property between the time it was declared blighted and the date of its condemnation. *Id.*

**9.** The holding of the case was limited to a finding that the owner could not seek relief for his damages by way of a counterclaim to the condemnation proceedings on his property. *Washington Univ.,* 626 S.W.2d at 377–78.

designation "is treated much the same as the threat of condemnation proceedings, the initiation of condemnation proceedings, and negotiation by the condemnor with property owners for the purchase of their property, all of which are considered neither taking nor damaging within the meaning of Mo. Const. art. I, [section] 26." *Id.* at 376.

Further dicta in *Washington University* also suggested that remedies after a blight designation can be sought via a cause of action separate from a condemnation proceeding—such as a personal tort action—in order to seek damages equal to the amount of rent allegedly lost by reason of the pending condemnation proceeding. *Id.* at 377–78 (stating that actions related to loss of rental income are akin to tort actions because the damages at issue are not damages directly to the property itself). But, claims for precondemnation damages, if asserted in the form of a tort action as *Washington University* suggested might be permissible, ultimately would fail to provide property owners an adequate remedy for their damages because municipalities, acting in their governmental capacity, may claim sovereign immunity from such actions. *See Parish v. Novus Equities Co.,* 231 S.W.3d 236 (Mo.App.2007) (finding that a city was protected by sovereign immunity in a negligence action alleging failure to properly oversee a TIF developer's financing; declaring that a city's participation in a redevelopment agreement with a private developer is a governmental function protected by sovereign immunity because the city's role is to carry out the broader governmental mandate of protecting public health, safety, and welfare by seeking to rehabilitate a blighted area).

As *Tierney v. Planned Industrial Expansion Authority of Kansas City* noted, however, a claim asserting that condemnation blight constituted a form of inverse condemnation would not be subject to the same concerns about sovereign immunity raised by a tort claim. 742 S.W.2d 146, 155 (Mo. banc 1987). *Tierney* discussed that condemnation blight actions are inverse condemnation actions brought under the theory that there has been an unconstitutional taking and observed that sovereign immunity cannot protect a city from inverse condemnation claims because it would negate the "constitutional command that property not be taken without just compensation." *Id.* *Tierney* applied the dicta from *Washington University* in rejecting a property owner's effort to sue a city for condemnation blight where the claim for relief was based on the city's "passage of the blighting ordinance and the ordinance approving the initial redevelopment plan." *Id.* at 154 (discussing that a taking does not occur when a blighting ordinance is passed because there is not any assurance in a blight declaration that development of the property will proceed). This Court found against the condemnation blight plaintiffs in *Tierney* based on the record in that case, such that nothing in *Tierney* forecloses recognizing a cause of action for condemnation blight that resembles a claim for inverse condemnation. *See id.* at 155–56 (finding that the claim was properly dismissed for insufficient evidence).

## IV. Should Property Owners' precondemnation damages be remedied?

This Court has long-recognized that the common, long delays associated with blight designations and condemnation proceedings can damage property owners' interests. *See Washington Univ.,* 626 S.W.2d at 375–76. In *Washington University* this Court noted:

This case involves a problem which has plagued the judiciary of this state for some time without satisfactory resolu-

tion. It arises with increasing frequency because of redevelopment of metropolitan areas. To start redevelopment, the area involved is declared blighted by the municipal legislative body and becomes subject to redevelopment.... Because of the blight designation and the general public knowledge that the property will be acquired for redevelopment, an exodus of tenants ensues, sometimes allegedly encouraged by the redevelopment authority, and no equivalent influx of similar tenants occurs. Often times the property depreciates and deteriorates, the neighborhood declines, vandalism and destruction of the property occurs, and the landowner, anticipating the eventual taking of the property, does not expend money to improve his unproductive asset.

*Id.* at 375.

But, Property Owners' case illustrates that the problems at issue in *Washington University* remain a challenge nearly two decades later. And, it places squarely before this Court the issue addressed in dicta in *Washington University*—whether Missouri law provides a remedy for precondemnation damages of the type alleged by Property Owners, and what form of action that remedy will take.

In *Washington University*, this Court recommended that "[t]he ideal solution" to precondemnation damage problems "would be for the legislature to make [a] provision for the allowance of damages in appropriate circumstances and upon proper proof of loss or damage, or to provide for a different time of taking in cases where the condemnor has cast a cloud of blight upon the property in advance of the actual taking." *Id.* at 378. In 2006, the legislature provided some relief to landowners that suffer damages under the "cloud of condemnation." The new legislation, however, covers landowners' damages only if the condemnor abandons the condemnation proceedings. Section 523.259, RSMo Supp.2007, provides:

1. If any condemning authority abandons a condemnation, each owner of interests sought to be condemned shall be entitled to recover:

(1) Their reasonable attorneys' fees, expert expenses and costs; and

(2) The lesser of:

(a) The owner's actual damages accruing as a direct and proximate result of the pendency of the condemnation if proven by the owner; or

(b) The damages required to be paid to an owner in the event of an abandonment under the terms of the applicable redevelopment plan or agreement.

In the event that the applicable redevelopment plan or agreement is silent as to damages required to be paid to an owner in the event of an abandonment, a court shall order the condemning authority to pay the owner's actual reasonable attorneys' fees and expenses, and shall award damages accruing as a direct and proximate result of the pendency of the condemnation if proven by the landowner.

2. The provisions of this section shall only apply to redevelopment plans or agreements entered into after December 31, 2006.

Section 523.259, RSMo Supp.2007, however, provides no remedy to plaintiffs like Property Owners because there has been no "abandonment" in this case. Also, Property Owners' case predates the applicability date in the statute. Professor Whitman has noted, though, that "it is not easy to see how adverse precondemnation activities of governments or redevelopers can be effectively remedied by statute[—because] [t]he lines between reasonable and unreasonable delay, between legiti-

mate and illegitimate activity by condemnors and between advance public disclosure of planned takings and 'defamation' of neighborhoods may be too blurred to be defined usefully by legislation." Whitman at 758. For these reasons, he has posited that courts "may be much better suited than the legislature" to address how precondemnation damages should be remedied, because courts can better allocate the risk of "imposing unfairly on private landowners the costs of projects, whether successful or failed, that were designed and intended to meet public needs." *Id.*

While statutes may be helpful in outlining remedies available to property owners, they are not determinative. Property owners enjoy constitutional protections that ensure that their property "shall not be taken or damaged for public use without just compensation." Mo. Const. art. I, section 26; *see also* U.S. Const. Amend. V (providing that private property shall not be taken for public use without just compensation). These constitutional guarantees require that courts recognize that property owners are entitled to a remedy even where statutes do not provide one.

As noted above, several jurisdictions recognize claims for condemnation blight under the theory of inverse condemnation. Although a property owner has never been successful in bringing such a claim

in Missouri, Missouri courts have suggested property owners can prevail against condemning authorities for claims relating to condemnation blight where they provide specific evidence demonstrating aggravated delay, bad faith, or untoward activity by the condemning authority. *See Land Clearance for Redevelopment Auth. of the City of St. Louis v. Morrison*, 457 S.W.2d 185, 199 (Mo. banc 1970) (denying a property owner relief for claims alleging damages from loss of rental tenants and vandalism of his property suffered after condemnation proceeding began on the property, noting that the condemnation action at issue did not involve "a situation of aggravated delay or untoward activity on the part of the Authority such as has been found to have constituted a taking" in other states' cases [10]); *State ex rel. Mo. Highway & Transp. Comm'n v. Edelen*, 872 S.W.2d 551, 558 (Mo.App.1994) (denying a property owner relief where his property was under the threat of condemnation for 10 years, because property owner did not have evidence to prove aggravated delay, bad faith, or untoward activity by the condemning authority); *Roth*, 688 S.W.2d at 777–78 (citing *Morrison*, 457 S.W.2d at 198–99, for the proposition that there is no "perfect system of reimbursement" in eminent domain cases, but noting that *Morrison* discussed "aggravated delay or untoward activity" by

---

**10.** *Morrison* derived its "aggravated delay or untoward activity" requirement from: *Sayre v. United States*, 18 Ohio Misc. 23, 282 F.Supp. 175, 185 (1967) (holding "abuse of the exercise of the power of eminent domain would constitute a taking of property without just compensation if that abuse directly and proximately contributes to, hastens, and aggravates, acting alone or in combination with other causes, the deterioration and decline in value of the area and the subject property"); *Foster v. City of Detroit*, 254 F.Supp. 655, 662 (E.D.Mich.1966) (noting a city's actions had encouraged and aggravated deterioration of the condemned property and there was evi-

dence of "protracted delay"; finding an unconstitutional taking had occurred); and *City of Detroit v. Cassese*, 136 N.W.2d at 900 (discussing that a taking could be shown by alleged precondemnation bad acts by a city that were directed at the property set for condemnation—such as sending letters to tenants, filing lis pendens, initiating intense building department inspections and issuing citations against owners for any violations of the building code, and refusing a permit for a long-established business to continue at the property because it was going to be condemned). *See Morrison*, 457 S.W.2d at 194–96, 199 (referring to these Michigan and Ohio cases).

the condemning authority as a prerequisite to recovery; and finding that the plaintiffs had shown substantial evidence of "aggravated delay" where seven years passed after announcement of condemnation plans until the condemnation award was entered; and finding that there was evidence of "untoward activity" shown by denial of building permits and threatening statements by condemnor's attorney).

Considering the constitutional prohibition against takings without just compensation, this Court holds that actions for condemnation blight are inverse condemnation claims that property owners may advance in order to recover consequential precondemnation damages, such as the claims brought by Property Owners in this case for increased operating costs and for lost rental and lease income.[11]

Because some delays relating to condemnation proceedings are natural and unavoidable, before property owners have a viable cause of action for precondemnation damages, they must establish that there has been aggravated delay or untoward activity in instituting or continuing the condemnation proceedings at issue. Without this standard requiring a showing of "aggravated delay or untoward activity," every condemnation case would give rise to a separate cause of action based on precondemnation activity, because the condemnation process involves governmental and judicial decisions that are endemic with delays.

Determining whether a condemnor has acted with undue delay should include consideration of the time limitations for condemnation proceedings established by the legislature.[12] *See* section 99.810.1(3); section 523.274.2, RSMo Supp. 2007. Where a condemning authority's delays have not exceeded statutory limitations, the delays should not be labeled as "aggravated" without additional evidence of related "untoward activity."[13]

Additionally, plaintiff property owners must prove that their damages were caused by the condemning authority's actions or inactions. Proving causation in condemnation blight cases is inherently challenging, as presumably cities usually do not attach blight designations to properties that are not already in decline.

## V. Property Owners' claims survive summary judgment

Property Owners' claims in this case allege genuine issues of disputed material fact relating to whether the City's actions constituted "aggravated delay or untoward activity" in instituting or continuing the condemnation proceedings on the property.

They have alleged a de facto taking of their property resulting from the exodus of rental tenants from their property after the City declared it blighted. They contend that the City failed to enforce plan timetables for acquisition and redevelop-

---

11. To the extent that dicta in *Washington University* suggests that a tort action should be brought rather than an action in inverse condemnation, that dicta is disapproved and should no longer be followed.

12. Statutory limitations, however, are not the only measures for delay, as a condemning authority may adopt its own time limitations or goals for the eminent domain proceedings at issue.

13. The existence or nonexistence of "untoward activity" is determined by reviewing the circumstances and facts of each case. These circumstances might include an argument that "untoward activity" is shown where a condemning authority repeatedly renewed its blight designation of a property as permitted by section 523.274.2, RSMo Supp.2007, but did so without just cause.

ment of the property, which has been declared blighted for five years. They also assert that the City has harassed them with building inspections and notices of code violations and by discouraging new tenants from renting in the property.

In contrast, the City denies the redevelopment plans have been unduly delayed, and it contends that it has not violated the time requirements imposed by section 99.810.1(3). It argues that there are no applicable "plan timetables" at issue and maintains that it has spent five years "consistently moving forward" to redevelop the property. It denies any harassment of Property Owners or their tenants, and it contends that Property Owners' damages are caused by their inability "to attract and keep tenants for a reasonable rate of return on the property [because of their] own inability to properly manage [the] property."

The variance between the facts alleged by Property Owners and the City sufficiently demonstrates that there are genuine issues of material fact in dispute about whether the City's actions show "aggravated delay or untoward activity" that could merit recovery of precondemnation damages. As such, Property Owners' claims survive summary judgment.[14]

## VI. Property Owners' claims are ripe

 Property Owners *need not wait* until their property is condemned to seek precondemnation damages, as suits can seek awards of damages for harm that is ongoing. *See Davis v. Laclede Gas Co.,* 603 S.W.2d 554, 556 (Mo. banc 1980) (holding that in cases "where the wrong may be said to continue from day to day, and to create fresh injury from day to day, and the wrong is capable of being terminated,

a right of action exists for the damages suffered within the statutory period immediately preceding suit."); *Cacioppo v. Sw. Bell Tel. Co.,* 550 S.W.2d 919, 925 (Mo.App. 1977) (rejecting the argument that a continuing trespass by defendant utility company for two decades entitled the plaintiff to damages lasting until the defendant's trespass ceased because "if such were the case, it would seem that if defendant never removed the [trespassing] junction box, plaintiff's cause of action would never accrue"); *see also Chesterfield Vill., Inc. v. City of Chesterfield,* 64 S.W.3d 315, 320 (Mo. banc 2002) (finding a party can assert a claim for damages even though the precise nature of and extent of an injury may be unknown, and thereby suggesting that a final municipal action—such as formal condemnation proceedings—is not a requirement of ripeness in a tort cause of action).

## VII. Conclusion

For the foregoing reasons, the trial court erred in entering judgment against Property Owners. The judgment is reversed, and the cause is remanded.

STITH, C.J., TEITELMAN, LIMBAUGH, WOLFF and BRECKENRIDGE, JJ., and ODENWALD, Sp.J., concur.

PRICE, J., not participating.

---

**14.** This holding is not a pronouncement that Property Owners are necessarily capable of proving "aggravated delay or untoward activ-

ity," or the other elements of their claim, including causation and damages, at trial.